# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CHRISTOPHER GENTILE, and JUAN A. CRAWFORD. <br><br>                     Plaintiffs, <br><br> v. <br><br> CASSI CREDEDIO, and KEVIN DOYLE. <br><br>               Defendants. | Case No. 1:21-cv-08528 (VSB) <br><br> **JURY TRIAL REQUESTED** |

### PLAINTIFFS' FIRST AMENDED COMPLAINT

Christopher Gentile and Juan A. Crawford (collectively, the "Plaintiffs"), states as follows:

1.    Plaintiffs bring this action against Ms. Cassi Crededio and Mr. Kevin Doyle (collectively, the "Defendants") for infringing on Mr. Gentile and Mr. Crawford's exclusive copyright rights associated with their work "Untitled Wyoming Project" a.k.a. The Monarch, referred to herein as the "Work" or "Untitled Wyoming Project," which is a screenplay that was conceived by Plaintiffs as a television series situated in the Western US in the 1870s.

2.    This action arises from Ms. Crededio's and Mr. Doyle's unauthorized registrations of early versions of the Work with the United States Copyright Office (the "U.S. Copyright Office") without the explicit authorization of Mr. Gentile and Mr. Crawford. In addition, Mr. Doyle has attempted to claim the Work as his own by pitching it to various talent agencies.

3.    Mr. Gentile and Mr. Crawford are the exclusive authors of the Work. Although, at times, Defendants assisted Plaintiffs in drafting the Work, Plaintiffs never relinquished control over the direction, scope and words of the Work.

4.      Ms. Crededio was hired by Plaintiffs on or about October 14, 2019 to assist in the drafting of the opening acts of the Work. She entered into a written agreement on October 22, 2019, in which she agreed that she would not disclose the Work to any third party.  At all times while working on this project, Ms. Crededio was following the explicit instructions provided by the Work's authors and owners, Mr. Gentile and Mr. Crawford.

5.      It was made clear to Ms. Crededio that she was hired to implement Plaintiffs' verbal instructions, written outlines, and rough drafts of the Work.  Any written contribution by Ms. Crededio was done at the direction of Plaintiffs.  To the extent that Ms. Crededio is considered the author of any portion of the Work, her involvement in drafting the Work constituted a work made for hire arrangement under copyright law and ownership rights in the Work therefore reside with Plaintiffs.  Subject to Plaintiffs' approval, Ms. Crededio was paid a sum of $500 for each act she completed.

6.      Following completion of a draft of the opening acts of the Work, and without consulting Plaintiffs, Ms. Crededio submitted an application to register that draft of the Work with the U.S. Copyright Office on November 15, 2019, which was later granted.  This copyright is invalid, because Ms. Crededio is not the owner or author of the Work.

7.      Subsequently, Mr. Doyle asked Ms. Crededio for permission to register another version of the Work that was based on the original draft of "Untitled Wyoming Project".  Based on Ms. Crededio's invalid copyright of the Work, Mr. Doyle asked for permission to register his version of the Work.  Because Ms. Crededio was not the author of the Work, and at most her contributions were a work for hire, she had no legal authority to register the Work with the U.S. Copyright Office, or subsequently to allow Mr. Doyle to register any work relating to or based off of, Untitled Wyoming Project, rendering both copyrights invalid.

8.     By submitting applications for copyrights of the Work based on false premises, Ms. Crededio and Mr. Doyle have infringed Plaintiffs' exclusive copyright rights.   Plaintiffs are entitled to a declaration that they are the exclusive owners and authors of the Work.

## PARTIES

9.     Plaintiff Christopher Gentile is a United States citizen residing in New York, New York.  Mr. Gentile originally conceived of the idea for "Untitled Wyoming Project," and is one of the authors of the Work at issue here.

10.     Plaintiff Juan A. Crawford is a United States citizen residing in New York, New York.  Together with Mr. Gentile, Mr. Crawford authored and created the Work.  On or about July 11, 2019, Mr. Crawford registered "Untitled Wyoming Project" with the Writers Guild of America ("WGA") before either Defendant was involved with the Work and before any other registration had been filed.

11.     Defendant Cassi Crededio is an individual who resides in Wood Dale, IL. Defendant Crededio was employed by Plaintiffs to transcribe their directions and instructions for the first three acts of Untitled Wyoming Project.  Ms. Crededio was Plaintiffs' employee from October 14, 2019 through November 2, 2019.  It was within the scope of that employment that Ms. Credidio assisted in drafting the Work.

12.     Defendant Kevin Doyle is an individual who resides in New York, New York. Defendant Doyle was allowed by Plaintiffs to oversee "Untitled Wyoming Project".  In light of their twenty-year friendship, Mr. Gentile offered Mr. Doyle the opportunity to work on "Untitled Wyoming Project" as a courtesy to give Mr. Doyle experience in the screen writing industry.

## JURISDICTION AND VENUE

13.    This is an action for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, and for copyright infringement in violation of the copyright laws of the United States, 17 U.S.C. § 101 et seq., including 17 U.S.C. § 411(a).

14.    This Court has subject matter jurisdiction of this action pursuant to the Copyright Act and the Judicial Code, 28 U.S.C. §§ 1331 and 1338(a).

15.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1400(a) because Plaintiffs and Defendant Doyle reside in this District and because the injury caused by the acts alleged in this complaint was felt in this District.

16.    This Court has personal jurisdiction over the Defendants pursuant to New York C.P.L.R. §§ 302(a) and/or 301.

## FACTS

### A.    PLAINTIFFS ORIGINALLY CONCEIVE THE IDEA FOR THE WORK

17.    The idea for Untitled Wyoming Project first came to Mr. Gentile fifteen years ago. He was discussing some of the hit shows of the day with a director from the long running NBC show, Law and Order.  In particular, Mr. Gentile and this director remarked that there were several high quality shows centered around the "flawed hero" model, specifically, Tony Soprano in The Sopranos and Don Draper in MadMen.  Mr. Gentile noted that there was no similar "flawed hero" entertainment that focused on a strong female lead.  The Law and Order director expressed his view that this was not likely to happen.

18.    Mr. Gentile believed in his idea, however, and looked for opportunities to create a drama focused around a flawed female heroine.  Several years later, he learned that Wyoming was the first state or territory in the nation to grant suffrage to women, in 1869.  He also learned that these rights were made possible by the influence of the madams in that territory, who ran houses

of prostitution that serviced, among others, the mining communities in the area. The genesis for "Untitled Wyoming Project" was born.

19.    Mr. Gentile and Mr. Crawford have been long-time friends and colleagues. Both studied at the prestigious William Esper Studio in Manhattan, which is often listed among the 25 best drama schools for a Master of Fine Arts in the nation. In 2019, Mr. Gentile discussed his idea for a period drama set in the late 1800's American West, and focusing on a madam who ran a brothel, but also championed women's rights.

20.    Mr. Gentile and Mr. Crawford together conducted extensive research into this unique historical period so that they could begin to develop a script for a television series focused on the role that madams of brothels in American West played in bring suffrage rights to women. As part of their research, they consulted the following texts: "A Renegade History of the United States", by Thaddeus Russell; "The Lost Sisterhood: Prostitution in America 1900-1918", by Ruth Rosen; "Rocky Mountain West: Colorado, Wyoming, & Montana 1859-1915", by Duane A. Smith; "Daughters of Joy, Sisters of Misery: Prostitutes in the American West 1865-90", by Anne M. Butler; "Buffalo Bill's America: William Cody and the Wild West Show", by Louis S. Warren; "Wicked Women: Notorious, Mischievous and Wayward Ladies from the Old West", by Chris Enss; "A Curious History of Sex", by Kate Lister; "Soiled Doves: Prostitution in the Early West", by Anne Seagraves; "Brothels, Bordellos, & Bad Girls: Prostitution in Colorado 1860-1930", by Jan MacKell; "Outlaw Tales of the Old West", by Erin Turner; "The Great Wyoming Whorehouses", a Historic Chronicle, by Tom Lawrence; and "Red Light Women of the Rocky Mountains", by Jan Mackell.

21.    Armed with this research and their ideas, Mr. Gentile and Mr. Crawford began to draft the early versions of the Work. Mr. Crawford wrote a first draft of the first few scenes of the

Work, and submitted this version of the Work to the Writers Guild of America ("WGA").  These first pages of  the Work, as filed with the WGA, formed the underlying basis for all subsequent versions and derivations.

### B.    Ms. Crededio's  Relationship and Employment with Plaintiffs

22.    Ms. Crededio met Mr. Crawford through her father, who had worked as a sound and lighting crewmember on a project where Mr. Crawford had an acting role.  Ms. Crededio was on set occasionally with her father.  At one point, she was speaking with Mr. Crawford and mentioned that she was an aspiring writer.  Mr. Crawford remarked that he and Mr. Gentile were looking for an assistant to reduce their various script ideas to writing.  They were very busy and did not always have the time to transcribe the plot lines, characters, dialog and scenes they had developed mentally and through conversations with each other.

23.    Ms. Crededio did not have any professional credits to her name, and this would be a way for her to earn some experience, as well as some money.  Ms. Crededio's lack of experience is confirmed through various text messages between Mr. Crawford and Ms. Gentile.  In November of 2019, Mr. Crawford asked Ms. Crededio, "Can you please share with us what prior projects you have written on that were picked up by network or streaming."  Ms. Crededio's response confirmed that she had no meaningful prior experience, and indeed, her limited career displays a lack of focus on screenwriting: "I have been raised in a film studio called Chicago Studio city learning and observing on different sets for years now… I veered off to music and fashion for awhile.  I was running social medias and creating content for different artists and platforms, Russ Liquid, Vibe Szn, and thefemaleplanet to name a couple you can search on IG.  I worked as a writing assistant for Fox network in 2017 for an internship with University, which really brought me back to film.  I've written over 150+ pages of my own content. Partially, why I'm going to LA is to talk with a script supervisor at Apple … about a personal project done by me and another freelance writer . .

. . Regardless of all that, this collaboration has been huge for me.  I have put much focus into it and am extremely thankful for the opportunity."  Mr. Crawford responded, "[T]o be clear, no direct network or streaming pickups or credits right?"  Ms. Crededio did not respond to that question.

24.    Mr. Crawford mentioned that he and Mr. Gentile could consider hiring Ms. Crededio as an employee to assist with work on the Untitled Wyoming Project and any other screenplays they might conceive of.  He explained that, particularly because Ms. Crededio did not have any experience, he and Mr. Gentile would essentially be dictating the particulars of the scenes, characters, dialog and plot, which Ms. Crededio would transcribe.  At the outset, it was contemplated that Ms. Crededio would work on the Untitled Wyoming Project to begin and any other projects conceived of by Plaintiffs.

25.    On October 22, 2019, Ms. Crededio entered into a written Confidentiality Agreement with Mr. Gentile ("Confidentiality Agreement").  Pursuant to the Confidentiality Agreement, Ms. Crededio agreed that she would "treat all Confidential Information in the strictest confidence and shall not use such Confidential Information for any purpose other than [her] work on the Project."  "Confidential Information" is defined as "[a]ny and all information and materials relating to Untitled Wyoming Project/Soiled Doves/Wild Country Production (the 'Project'), Juan Antonio Inc. and any of its affiliates . . . including, without limitation, scripts, program footage and elements, dailies, working and final cuts, digital media, visual effects, and photographs." These materials are deemed "confidential and proprietary" to Juan Antonio Inc., Mr. Crawford's production company.

26.    During the course of her employment, and according to the explicit direction of Plaintiffs, Ms. Crededio helped draft the Work's first three acts.

27.    Ms. Crededio's employment lasted approximately three weeks, from October 14, 2019 through November 2, 2019.  During this time, Ms. Credido was provided instructions regarding the content and structure of the Work.  She was given detailed verbal instructions and/or physical outlines as well as rough drafts provided by the Plaintiffs demonstrating Plaintiffs' conception of the Works.  The explicit instructions that Plaintiffs gave Ms. Crededio with regard to drafting the Work is set forth below, in paragraphs 45-68.

28.    In exchange for her assistance on the Work, Ms. Crededio was paid a sum of $500 for each act she drafted.  During her time spent on the work, Ms. Crededio was given explicit instructions by Mr. Gentile and Mr. Crawford with regard to: creation of characters, descriptions of scenes, development of themes, and specific dialog.  Her role was simply to reduce to writing the particular instructions provided to her by Mr. Gentile and Mr. Crawford.

29.    This is summarized in a text Mr. Crawford wrote to Ms. Crededio on October 22, 2019, in which he stated: "You were not able to write what's done thus far without me and Chris. Even what you have written was inspired through our conversations and direction, that's the fact of the matter.  I've already registered this project and the IP prior to hiring you for writing man hours.  That means the concept is protected….The original vision for this piece is the IP of Chris [Gentile], I told you that before.  I was brought on and then I hired you for writing hours."  Later in the text conversation, Ms. Crededio acknowledged, "[I] am aware that there is IP belonging to Chris [Gentile] of course."

30.    In addition, pursuant to her employment, Mr. Gentile and Mr. Crawford established firm deadlines by which Ms. Crededio was to complete her drafts of each act.  If Ms. Crededio failed to meet any of her deadlines, the agreed sum of $500 would be docked by a fixed amount for each day the draft was late.

31.    Ms. Crededio worked on Acts 1, 2, and 3 of "Untitled Wyoming Project" and was compensated on three separate occasions as she completed her role in drafting each Act.

32.    On October 14, 2019, Mr. Gentile paid Ms. Crededio $500 via Chase QuickPay for her work on Act 1.

33.    On October 25, 2019, Mr. Gentile again paid Ms. Crededio $500 via Chase QuickPay for her work on Act 2.

34.    Finally, on November 2, 2019, Mr. Gentile paid Ms. Crededio a sum of $287 via Chase QuickPay for her work on Act 3.  Ms. Crededio only received $287 for her services on Act 3 because she failed to meet her established deadline, and was therefore deducted $71 for each of the three days past the deadline.

35.    On November 3, 2019, Ms. Crededio wrote via text that she should have been paid the full $500 for Act 3 because the reason for her delay was due to her grandmother's death.  Mr. Crawford explained, "it's not a penalty regarding personal life, everyone is managing that along with work so please do not confuse the two…[I]t would make sense for deadlines and due dates to be met like with any other job hired for.  That was the logic."

36.    Later, on November 11, 2019, Mr. Crawford explained, "[Y]ou were hired to physically write based on the conversations to dictate what to write.  You wrote and were compensated for that as agreed.  You do understand that correct?"  and "You were hired for man hours and you completed those and were compensated."

37.    At Plaintiffs' instruction, Ms. Crededio used a screenwriting software and a platform called "WritersDuet."  The program is designed to be collaborative and allows writers to "co-write in real time". https://www.writerduet.com.  Through this method Plaintiffs at all times had access to the Untitled Wyoming script, and could see and comment on any changes Ms.

Crededio made to any individual scene. They either approved Ms. Crededio's words, suggested ways that they could be re-written, or simply re-wrote them themselves to ensure that what Ms. Crededio was writing in conformity with their directions.

38.    Ms. Crededio completed work on three acts of the script, and per her employment agreement with Plaintiffs, she was paid $500 upon completion of each act. Ms. Crededio's employment was thereafter terminated, because she had proven she was unable to meet deadlines set by Plaintiffs.

### C.    EVOLUTION OF UNTITLED WYOMING PROJECT

39.    Mr. Gentile and Mr. Crawford are the indisputable creators of "Untitled Wyoming Project." While Ms. Crededio assisted with drafting the first version of the Work, it has gone through many adaptations and permutations, and as of the filing of this Amended Complaint, is still not finished.

40.    To avoid confusion, Plaintiffs' claims against Ms. Crededio derive from her unauthorized action to gain copyright protection of the version of the script that she sent to the U.S. Copyright Office in or around November 15, 2019. Exhibit A to this Amended Complaint is a copy of the version of the script as it existed when they ceased to employ Ms. Crededio on or about November 2, 2019, which has been maintained by Plaintiffs. The version Ms. Crededio submitted for copyright protection is either identical to Exhibit A, or is a derivative thereof.

41.    Plaintiffs' claims against Mr. Doyle derive from his unauthorized action to sell the Work as his own, using either Exhibit B attached to this Amended Complaint, or a derivative thereof. Exhibit B is a copy of the version of the script as it existed when Plaintiffs ended their relationship with Mr. Doyle.

42.    Plaintiffs originally conceived the idea for the "Work" and memorialized their ideas in writing in a draft version of opening dialog. Mr. Crawford submitted this version of the Work

-10-

to the Writers Guild of America ("WGA"). These first pages of the Work, as filed with the WGA, were the genesis of the Work, and the underlying basis for all subsequent versions and derivations.

43.    Plaintiffs then developed the WGA submission into a draft of their screenplay. Defendants' primary role in assisting in the "Works" development was to smooth out the edges of Plaintiffs' rough drafts, and reduce to writing Plaintiffs' explicit instructions concerning character creation, plot development, scene description and dialog.

44.    Throughout the screenwriting process, which has now spanned the course of nearly three years, the "Work" has seen various individuals, including the Defendants in this action, assist in turning Plaintiffs' written work into a product that would be ready to be sold as a screenplay. During this process, the only parties who have been constant in developing the Work are the Plaintiffs.

D.    **PLAINTIFFS ARE THE AUTHORS OF THE VERSION OF THE WORK THAT MS. CREDEDIO SUBMITTED FOR COPYRIGHT PROTECTION**

45.    Ms. Crededio was employed by Plaintiffs to assist in the drafting of the Work's first three acts, but her role was reduced to that of a scribe, as she merely transformed instructions dictated by Plaintiffs into writing.

46.    Pursuant to this Court's directive in its Order dated July 1, 2022, ECF No. 28, Plaintiffs have attached as Exhibit A the version of the Work as it existed at the end of Ms. Crededio's employment with Plaintiffs. Plaintiffs provide a detailed explanation on a scene-by-scene basis of their directives to Ms. Crededio in drafting the Work.

1.    **Act I, Scene 1.**

47.    Act I, Scene 1 of the Work vividly describes the main character of the Work, "███████". Plaintiffs specifically authored every aspect of "Travis Wayne's" character, including his name, personal description, wardrobe, and the overall direction surrounding the

events occurring in Act 1; Scene 1.  *See* Exhibit A, pp 2-3.  Plaintiffs also named and drafted the

character description of ███████████.  *Id.*  Finally, Plaintiffs were responsible for the action

and overall dialog in Act 1: Sc 1.  This includes the events surrounding ████████████████

██████████████████████  As a full reading of the pilot script reveals, ████████████████

████████████████  is a central plot point to the pilot script, and Ms. Crededio had no input with

regard to this plot point.

**2.     Act I, Scene 2:** ████████████████████████

48.     Act I, Scene 2 involves a description of a █████████████  Plaintiffs were

responsible for the description of the ██████████████  Plaintiffs also created the character

██████████████.  *See* Exhibit A, pages 3-4.

**3.     Act I, Scene 3:** ████████████████████

49.     Act I, Scene 3 follows the actions of the ██████████████ characters concerning

both the characters of the █████████████████  Plaintiffs authored the action, description

and dialog of this entire scene surrounding the ██████████████  *See* Exhibit A, pages 4-6.

**4.     Act I, Scene 4:** ██████████████████

50.     Act I, Scene 4 follows the action and dialog of the characters ████████████████

██████████████ and the ██████████████  Here, Plaintiffs dictated all character descriptions as well

as the actions and major dialog points associated with this scene, including the setting and the

description of ████████████████████████████ as the scene progresses. *See* Exhibit

A, pages 6-9.

**5.     Act I, Scene 5:** ██████████████████████

51.     In scene 5 of Act I, Plaintiffs dictated and drafted all camera angles, characters, and

actions associated with Scene 5. This includes the major dialog points between characters ████████

█████████████████████████████  *See* Exhibit A, pages 9-11.

6.    **Act I, Scene 6:** ███████████████████████

52.    In Act 1, Scene 6, Plaintiffs dictated the description, motivation, action and backstory of the characters ████████████████ Plaintiffs were also responsible for the specific wording of the dialog in this scene including but not limited to dictating the major plot points of █████████████████████████████████████ ███████. *See* Exhibit A, Pages 11-14.

7.    **Act II, Scene 7:** ████████████████████████

53.    Plaintiffs' dictated the overall setting of Act II, Scene 7, as well as the description, dialog, and backstory of the character ██████████ including his motivations and actions. Plaintiffs also dictated the dialog surrounding the character ████████ as well as the character ████████████ including both characters description motivation and actions associated with Scene 7.  Plaintiffs were also responsible for dictating the major plot points in Scene 7. *See* Exhibit A, Pages 14-15.

8.    **Act II, Scene 8: Ext. Continuous.**

54.    Plaintiffs dictated the setting of Act II, Scene 8. Plaintiffs were also responsible for the descriptions, actions, dialog and motivations of characters ██████████ and ██████████ as it relates to Scene 8.  *See* Exhibit A, Page 15.

9.    **Act II, Scene 9:** ███████████████████████

55.    Plaintiffs dictated the setting of Act II, Scene 9.  Plaintiffs were also responsible for the descriptions, actions, dialog and motivations of characters ████████████ and ██████████ as it relates to Scene 9.  *See* Exhibit A, Pages 15-18.

10.    **Act II, Scene 10:** ██████████████████████████

56.    Plaintiffs dictated the setting of Act II, Scene 10 including the descriptions of ████████████████ nd the ██████████ as well as the descriptions actions, dialog and motivations of the ████████████ characters. Plaintiffs also dictated and drafted the descriptions, actions, dialog

and motivations of the character █████████████ In addition, Plaintiffs were also responsible for drafting the descriptions actions, dialog, backstory and motivations for the character ██████ Plaintiffs were also the central driving force behind drafting the dialog and scene surrounding ████████████ which was the major plot in this scene. *See* Exhibit A, Page 20.

**11.    Act II, Scene 12:** ████████████████████

57.    Plaintiffs were responsible for dictating the overall setting in this scene as well as the descriptions actions, dialog and motivations of characters ██████████ ██████████, and ██████ Plaintiffs also drafted all major plot points associated with Scene 12. *See* Exhibit A, Pages 21-22.

**12.    Act II, Scene 13:** ████████████████████

58.    Plaintiffs dictated the overall setting in Scene 13 as well as the descriptions actions, dialog and motivations of the characters ██████ and ████████ *See* Exhibit A, Pages 22-23 .

**13.    Act II, Scene 14:** ████████████████████.

59.    Plaintiffs were responsible for drafting every component of Scene 14. *See* Exhibit A, Pages 23-25.

**14.    Act II, Scene 15:** ████████████████████

60.    Plaintiffs drafted all action and character dialog associated with Scene 15, including the descriptions of the ███████████████████████████ ██████ *See* Exhibit A, Pages 25-27.

**15.    Act III, Scene 16:** ████████████████████

61.    Plaintiffs authored all characters in Scene 16, including their dialog, motivations and actions.  Plaintiffs were also responsible for drafting the major plot of ██████████ ██████████████████████ *See* Exhibit A, Pages 28-30.

**16.    Act III, Scene 17:** ████████████████████

62.    Plaintiffs created, named, and authored the character ████████████, including her description, wardrobe, motivation and action associated with Scene 17. Plaintiffs also exclusively drafted a majority of dialog of Scene 17 including the major plot point in this scene of ██████████████████████████. *See* Exhibit A, Pages 30-33.

**17.    Act III, Scene 18:** ███████████████████

63.    Plaintiffs were responsible for drafting every component of Scene 18. *See* Exhibit A, Pages 33-35.

**18.    Act III, Scene 19:** ████████████

64.    Plaintiffs authored Scene 19's setting as well as all aspects of every character within Scene 19.  Plaintiffs also authored the major action in this scene ███████████████ ███████████████████████████████████████████████ ████████████.  In particular, Plaintiffs were very particular about this dialog because it was important to show ███████████████████████████████████ ████████████████████ Plaintiffs also authored the dialog between █████████ ████████████████ Finally, Plaintiffs authored all aspects of the creation of the character ███████ including her description, wardrobe, and dialog within this scene.  *See* Exhibit A, Pages 35-40.

**19.    Act III Scene 21:** ██████████████████████

65.    Finally, Plaintiffs authored all elements of the dialog in Scene 21.  Plaintiffs also introduced and authored the character ███████████████████ including all dialog, description, wardrobe, motivations, and actions associated with this character. *See* Exhibit A, Pages 42-45.

66.     As demonstrated in paragraphs 47-65 above, Plaintiffs are the authors of the version of the Work that Ms. Crededio submitted to the Copyright Office, and thereby obtained a copyright under false pretenses.  Plaintiffs provided explicit instructions regarding what Ms. Crededio should draft with regard to virtually every character, scene, string of dialog and plot point.  Ms. Crededio's role was primarily to reduce to writing Plaintiffs' detailed instructions.

67.     Text messages confirm that Plaintiffs re-wrote much of the work Ms. Crededio had done.  For example, on October 27, 2019, Mr. Crawford wrote to Ms. Crededio, "starting edits/rewrites from beginning then finish act 3 and into 4…"  Ms. Crededio responded, "So is act 3 finished yet?  If not I'll finish it tomorrow for new work week."  Mr. Crawford responded, "No need, it will be shortly," indicating that he would finish writing Act 3, after rewriting Acts 1 and 2.  Again on October 31, 2019, Mr. Crawford wrote, "Working through edit/rewrite and will be up to and finish act 3 by tomorrow."

68.     On November 11, 2019, Mr. Crawford wrote to Ms. Crededio with regard to her work: "It is being edited and rewrites. [sic]  Grammar has to be cleaned up and story need [sic] to tie together along with more dialogue and direction changes.  The final script will not even be recognizable compared to the rough draft and that's kinda the point for it to be able to sell."

### E.    MS. CREDEDIO AGREED TO AND THEN VIOLATED A CONFIDENTIALITY AGREEMENT CONCERNING HER INVOLVEMENT WITH UNTITLED WYOMING PROJECT

69.     In connection with her employment by the Plaintiffs, Ms. Crededio agreed to and did sign a Confidentiality Agreement where she expressly agreed to protect all confidential information associated with "Untitled Wyoming Project" on October 22, 2019.  Part of the reason Ms. Crededio agreed to sign the Confidentiality Agreement was due to her limited role in drafting the Work, and was interested in learning and developing under Plaintiffs guidance as a way to

break into the screenwriting industry.  At all times relevant to her working on the Work's Opening

Acts, Ms. Crededio knew that the Plaintiffs were the true authors of the entirety of the Work.

70.    As part of the of the Confidentiality Agreement Ms. Crededio agreed as follows:

> You agree that you shall treat all Confidential Information in the strictest
> confidence and shall not use such Confidential Information for any purpose
> other than your work on the Project.

> You further agree that, without the Company's prior written consent, you
> shall not provide, duplicate, transmit, share, upload, or otherwise disclose,
> physically, digitally, verbally or in writing or otherwise, the Confidential
> Information to any third party in any form.   Being in unauthorized
> possession of or disseminating Confidential Information may subject you to
> immediate termination and also legal liability.

71.    On November 15, 2019, after finishing her employment on the opening acts of

"Untitled Wyoming Project" Ms. Crededio filed her own registration with the U.S. Copyright

Office.

72.    Ms. Crededio did not refute or ask for any alteration of any of the language provided

in her confidentiality agreement before signing the agreement on October 22, 2019.

73.    Ms. Crededio never spoke with Plaintiffs before deciding to file her registration of

Untitled Wyoming Project, in which she falsely represented that she was the owner and author of

the work.  Her filing of her registration statement violated Plaintiffs' rights under the copyright

laws in the Work, and constituted a breach of the Confidentiality Agreement.

F.    MS. CREDEDIO WAS PLAINTIFFS' EMPLOYEE, AND ANY CONTRIBUTIONS SHE
MAY HAVE MADE TO THE WORK WERE ON A WORK-FOR-HIRE BASIS

74.    To the extent that Ms. Crededio can establish that any of her contributions to the

Work were her own, she made those contributions on a work-for-hire basis.

75.    Plaintiffs retained absolute control over the composition of the Work.  They

provided explicit instructions on what to include, in many instances dictating specific scenes,

dialog, characters and plot lines.  They also had ultimate authority to reject, revise or restructure any of the words that Ms. Crededio wrote.

76.     Ms. Crededio possessed no screenwriting skills whatsoever when she was hired by Plaintiffs to assist with drafting the Work.

77.     At the time that Ms. Crededio was hired by Plaintiffs, it was contemplated that she would work on multiple projects as they arose.

78.     Ms. Crededio was paid in regular intervals upon completion of each act of the Work.  Further, Ms. Crededio had no discretion in setting her schedule, as she was provided with specific deadlines by which to complete her work.  Indeed, it was her inability to meet those deadlines that caused her termination.

79.     Ms. Crededio used a software program called "WriterDuet", which was provided by Plaintiffs.  WriterDuet allows multiple authors and collaborators to work together on the same project.  Specifically, it allows the users to see what changes others have made, and to comment on those changes or make additional edits.  It also permits text and video chats, so that collaborators may communicate easily with each other.  Plaintiffs selected WriterDuet so that they might retain full control over Ms. Crededio's writings in the script.  WriterDuet is available on a subscription basis.  Plaintiffs obtained and paid for a subscription to WriterDuet and allowed Ms. Crededio to access the program through their paid subscription.

### G.     MR. DOYLE'S INVOLVEMENT IN UNTITLED WYOMING PROJECT

80.     Mr. Gentile and Mr. Crawford have been friends for over twenty years.  During this time Mr. Gentile has routinely taken Mr. Doyle into his home, and assisted in Mr. Doyle's career aspirations whenever possible.  Unfortunately, on this occasion Mr. Doyle has taken advantage of Mr. Gentile's kindness, and in the process has attempted to portray Plaintiffs' work as his own.

81.     Plaintiffs offered Mr. Doyle the opportunity to work on "Untitled Wyoming Project" as a courtesy to give Mr. Doyle experience in the screen writing industry.

82.     Any and all, revisions, adaptions, or development of any of "Untitled Wyoming Project's" script, characters, scenes, setting, stage direction, or dialog contributed by Mr. Doyle were done at Plaintiffs' explicit direction.

83.     At no time did Mr. Doyle contribute any original work to the project. Mr. Doyle's entire claim to the "Untitled Wyoming Project" rests in the form of two draft scripts and a format bible where Mr. Doyle recorded all of his contributions.  None of these contributions were made independently of Plaintiffs' explicit direction.  Taking a previously transcribed work and copying it to a format bible does not grant Mr. Doyle authorship rights.  It was Plaintiffs who wrote and developed all characters, themes and dialog associated with "Untitled Wyoming Project."

84.     In a series of conference calls and "Whatsapp" exchanges between Plaintiffs and Mr. Doyle, Mr. Doyle repeatedly acknowledged that Plaintiffs are the true owners of "Untitled Wyoming Project".  Further, during these exchanges, Mr. Gentile routinely advised Mr. Doyle of changes that needed to be made to his drafting of portions of "Untitled Wyoming Project".

85.     Notably on April 28, 2020 (one day prior to Mr. Doyle sending his edits of the pilot script to Plaintiffs), Mr. Doyle sent Mr. Gentile the following message: "Dude you have the PILOT and the series trajectory your idea deserves. . . .[J]ump off the couch and scream out the fire escape window like that guy for the 1970's NETWORK movie." (emphasis added).

86.     On August 24, 2020 after receiving Mr. Doyle's edits in the form of a Format Bible, Mr. Gentile sent the following message: " I'd like to get on a call about some direction in the Bible that weren't discussed so that we can get on the same page."

87.     Thus at all times during "Untitled Wyoming Project," Plaintiffs were the authors of the Work.  Any contributions that were added by Mr. Doyle were done so based either on previous works drafted by Plaintiffs or by Plaintiffs explicit instruction.

**H.    PLAINTIFFS ARE THE AUTHORS OF THE WORK THAT MR. DOYLE CLAIMS AS HIS OWN**

88.     Attached as Exhibit B is the Work in the state that it was in when Mr. Doyle last worked on Untitled Wyoming Project.  As with the version that existed after Ms. Crededio severed ties with Plaintiffs, Plaintiffs are the authors version of the Work.  Thus, Plaintiffs specify below their involvement in drafting the version of the Work the last version of the Work in their possession that existed when they severed ties with Mr. Doyle.

**1.    Vignette 01. Int. █████████████████████████████
█████████████████████**

89.     Vignette 01 follows the action and dialog of the character ████████    Here, Plaintiffs dictated all character descriptions as well as the actions and major dialog points associated with this scene.  Plaintiffs were responsible for most of the drafting associated with Vignette 01 and provided their written work to Doyle in a series of "WhatsApp" messages.  *See* Exhibit B, Page 1

**2.    Scene 1: ████████████████████████████████████
████.**

90.     Plaintiffs dictated  the overall setting of  Scene 1, as well as the description, dialog, and backstory of the character ███████████, including his motivations and actions. Plaintiffs also dictated the dialog surrounding the character ████████████.  In addition, Plaintiffs dictated the opening credit images and music choice described in Scene 1.  *See* Exhibit B, Pages 1-3.

       3.       **Scene 2:** ███████████████████████████████
███████

91.     Plaintiffs dictated the overall setting of Scene 2, as well as the description, and

dialog, ███████, including her motivations and actions. Plaintiffs also dictated the dialog and

action surrounding the character ███████████. *See* Exhibit B, Pages 4-5.

       4.       **Scene 3:** ████████████████████████████████.

92.     Plaintiffs dictated the overall setting of Scene 3, as well as the description, and

dialog of ███████ including her motivations and actions in Scene 3. *See* Exhibit B, Pages 5-

6.

       5.       **Scene 4:** ████████████████████████████████

93.     Plaintiffs dictated the overall setting of Scene 4, as well as the description, and

dialog of ██████████, including his motivations and actions in Scene 4. *See* Exhibit B, Page

7.

       6.       **Scene 5:** ██████████████████

94.     Here, Plaintiffs dictated the description and dialog of the character ███████████

including his wardrobe and motivations associated with Scene 5. *See* Exhibit B, Pages 7-9.

       7.       **Scene 6:** ███████████████████████

95.     Plaintiffs dictated the interior design of the ███████ in Scene 6. Plaintiffs were

also responsible for the description and dialog of the characters "Emma", ████████████████,

███████████████████████ including their motivations and action associated

with Scene 6. *See* Exhibit B, Pages 10-14.

**8.**    **Scene 7:** ████████████████████████████████

96.    Plaintiffs dictated the action and setup associated with Scene 7.  Plaintiffs were also responsible for the dialog, motivation, and backstory of the character ████████ as it relates to Scene 7.  *See* Exhibit B, Pages 13-14.

**9.**    **Scene 8:** ████████████████████████

97.    Plaintiffs dictated the motivation, backstory, and dialog of the character ██████ as it relates to Scene 8.  Plaintiffs also dictated the action and motivation between characters ███████ ██████, and ████████ in Scene 8.  *See* Exhibit B, Pages 14-17.

**10.**    **Scene 9:** ████████████████████████

98.    Plaintiffs dictated scenery, action and dialog of the ████████ that commences in Scene 9.  Plaintiffs also dictated the motivation, backstory, and dialog of the character ████████ ████████████████████████████████████████████ in Scene 9.  *See* Exhibit B, Pages 18-19.

**11.**    **Scene 10:** ██████████████████████████

99.    Plaintiffs dictated all components of Scene 10.  *See* Exhibit B, Pages 20-25.

**12.**    **Scene 11:** ████████████████████████████

100.    Plaintiffs dictated all components of characters ██████████" and "████████ as it relates to Scene 11, including each character's background and wardrobe.  *See* Exhibit B, Page 26.

**13.**    **Scene 13:** ████████████████████████████

101.    Plaintiffs dictated the setting of Scene 13. Plaintiffs also dictated all components of the character ████████████ as it relates to Scene 13, including his dialog, backstory and motivation for Scene 13.  *See* Exhibit B, Pages 27-31.

**14.** ████████████████████████████████████

102.     Plaintiffs dictated the look and feel of all characters in Scene 14.  Plaintiffs also dictated each characters motivations, backstories and actions as it relates to Scene 14.  *See* Exhibit B, Pages 31-33.

**15.     Scene 15:** ████████████████████

103.     Plaintiffs dictated the wardrobe, motivations, actions and dialog of the characters ████████████████████" as it relates to Scene 15.  *See* Exhibit B, Page 34.

**16.     Scene 16:** ████████████████████████.

104.     Plaintiffs dictated and created the characters "████████████ including each character's dialog, motivations and actions associated with Scene 16.  *See* Exhibit B, Pages 35-37.

**17.     Scene 17:** ██████████████████████████

105.     Plaintiffs dictated all character components of Scene 17, including each character's, motivations, actions and dialog.  *See* Exhibit B, Pages 36-37.

**18.     Scene 18:** ████████████████████████.

106.     Plaintiffs dictated the action and setup of Scene 18 including the ████████ ████████████  *See* Exhibit B, Pages 37-38.

**19.     Scene 19:** ██████████████████████████

107.     Plaintiffs dictated all character components of Scene 19, including each character's motivations, actions and dialog.  *See* Exhibit B, Pages 38-39.

**20.     Scene 20:** ██████████████████████

108.     Plaintiffs dictated the action and setup of Scene 20 including ████████████ ████████████".  *See* Exhibit B, Pages 39-40.

21.    Scene 21: ███████████████████████████████

109.    Plaintiffs dictated all character components of Scene 21, including each character's motivations, actions and dialog.  *See* Exhibit B, Page 41.

22.    Scene 22: ████████████████████████████████████
███████

110.    Plaintiffs dictated all character components of Scene 22, including each character's motivations, actions and dialog.  *See* Exhibit B, Pages 41-43.

23.    Scene 23: █████████████████████████████

111.    Plaintiffs dictated the dialog, motivations and actions of the characters ██████ and "████" as they relate to Scene 23.  *See* Exhibit B, Pages 44-47.

24.    Scene 24: ███████████████████████████

112.    Plaintiffs dictated all components of the character ████" in Scene 24, including his motivation and action.  *See* Exhibit B, Pages 47-48.

25.    Scene 25: █████████████

113.    Plaintiffs dictated all components of all characters in Scene 25, including each character's motivations, actions and dialog.  *See* Exhibit B, Pages 49-54.

26.    Scene 26: ████████████████████████████████

114.    Plaintiffs dictated all components of character dialog, actions and motivations associated with Scene 26.  *See* Exhibit B, Page 55.

27.    Scene 28: ████████████████████████████

115.    Plaintiffs dictated all components of Scene 28.  *See* Exhibit B, Pages 56-57.

28.    Scene 29. ████████████████████████████

116.    Plaintiffs created all characters in Scene 29, including each character's motivation, dialog and action.  Plaintiffs also drafted the introduction of the character ████████ including his motivation and dialog.  *See* Exhibit B, Pages 58-63.

29.    **Scene 30.** ███████████████████████████

117.    Plaintiffs dictated the motivations, actions and dialog for the characters ████████

and ████████ as it relates to Scene 30.  *See* Exhibit B, Pages 63-64.

30.    **Scene 31.** ██████████████████████

118.    Plaintiffs dictated all components of each character in Scene 31, including each

character's motivations, actions and dialog.  *See* Exhibit B, Pages 64-65.

31.    **Scene 32.** ████████████████████████████

119.    Plaintiffs dictated all components of each character in Scene 32, including each

characters' motivations, actions and dialog.  *See* Exhibit B, Pages 66-68.

32.    **Scene 33.** ██████████████████████████
          ██████████████████

120.    Plaintiffs dictated all aspects associated with the murder of the character "Ex-

Justice" in Scene 33.  *See* Exhibit B, Page 69.

33.    **Scene 34. Ext. Train Tacks Outside Rock Springs. Night.**

121.    Plaintiffs dictated all aspects associated with the ████████████████ which

occurs in Scene 34.  *See* Exhibit B, Pages 69-70.

I.    **MR. DOYLE ATTEMPTS TO PORTRAY UNTITLED WYOMING PROJECT AS HIS OWN WORK**

122.    Over the course of the Spring and Summer of 2020, Plaintiffs spent valuable time

mentoring Defendant Doyle in the screen writing industry.

123.     Repeatedly throughout this process, Mr. Doyle inquired about submitting "Untitled

Wyoming Project" to various entertainment companies.  Each time this issue was discussed, the

Plaintiffs informed Mr. Doyle that the project was nowhere near ready to be pitched to any agency.

124.    Despite Plaintiffs informing Mr. Doyle, on multiple occasions, that they had no

interest in pitching their project in its current state, without permission or authority, Mr. Doyle

independently pitched the Work to the entertainment company Zero Gravity Management ("Zero Gravity").

125.    During this pitch Mr. Doyle falsely represented himself has one of the authors of "Untitled Wyoming Project". This falsehood lead Zero Gravity to request subsequent materials concerning the production of "Untitled Wyoming Project" from Mr. Doyle, and for all creative parties to sign release forms.

126.    Knowing that Mr. Gentile and Mr. Crawford were the rightful authors and owners of "Untitled Wyoming Project", and that any deal could not commence without releases from both Plaintiffs, Mr. Doyle approached Plaintiffs to discuss the "opportunity" of signing with Zero Gravity.

127.    Upon learning that Mr. Doyle had secretly approached Zero Gravity and falsely portrayed Untitled Wyoming Project", as his own work product, Plaintiffs realized that Mr. Doyle's intention was to steal their work product for his own gain. After this interaction, Plaintiffs ceased associating with Mr. Doyle.

128.    On October 10, 2020 Plaintiffs learned that Mr. Doyle had applied for, and been granted, a registration of the Work with both the WGA and the U.S. Copyright Office. In Mr. Doyle's registration to the U.S. Copyright Office he asserted himself as the owner and author of Episode 2 of "Untitled Wyoming Project", a project he entitled "Wonderland: the Equality State".

129.    Defendant Doyle's October 9, 2020 registration with the U.S. Copyright Office lists Ms. Crededio as providing Mr. Doyle with permission to file his registration under the "Rights and Permission" section of the registration.

130.    Thus, unbeknownst to Plaintiffs, Ms. Crededio apparently colluded with Mr. Doyle to transfer the rights in her invalid copyright to Mr. Doyle so that he could shop the Work on his own.

**J.    PLAINTIFFS FILE THEIR OWN COPYRIGHT REGISTRATIONS TO PROTECT THEIR OWNERSHIP AND AUTHORSHIP INTERESTS IN THE WORK**

131.    Once Plaintiffs were made aware of the registrations filed by both Defendants, they immediately sent Mr. Doyle a cease and desist letter on October 19, 2020, asking that Mr. Doyle cease his unlawful infringement of Mr. Gentile and Mr. Crawford's Work.  Plaintiffs had hoped notifying Mr. Doyle of his infringement on Plaintiffs' work would put an end to the dispute.

132.    After waiting over a month with no response from Mr. Doyle, Plaintiffs applied for their own copyright registration on November 27, 2020.  The U.S. Copyright Office granted such copyright for the dramatic work and music "Untitled Wyoming Project" a.k.a. Monarch, and assigned the Registration Number PAu004057984.

133.    In January of 2021, Plaintiffs' copyright application for the work "Untitled Wyoming Project" a.k.a. The Monarch was approved and registered by the U.S. Copyright Office.

**K.    PLAINTIFFS GAVE DEFENDANTS MULTIPLE OPPORTUNITIES TO CEASE THEIR UNLAWFUL INFRINGEMENT OF "UNTITLED WYOMING PROJECT" A.K.A THE MONARCH**

134.    From October 10, 2020, the date the Plaintiffs first learned of Defendants' copyright registrations, through the filing of this complaint Plaintiffs have given Mr. Doyle and Ms. Crededio multiple opportunities to cease their unlawful infringement of Plaintiffs' work.

135.    On October 19, 2020, Plaintiffs sent Mr. Doyle a cease and desist letter notifying him that his copyright registration was made under false pretenses as he was not the author of "Untitled Wyoming Project" a.k.a. The Monarch or any work derived therefrom.

136.     On November 25, 2020, Plaintiffs sent a similar cease and desist letter to Defendant Crededio which notified Ms. Crededio that 1) her November 11, 2019 copyright registration was made under false pretenses as she was not the author of  "Untitled Wyoming Project" a.k.a. The Monarch, and 2) that since she was not the author of the Work, Ms. Crededio did not have authority to give permission to Defendant Doyle to file his own copyright registrations concerning any work related to "Untitled Wyoming Project" a.k.a. The Monarch.

137.     In January of 2021, Plaintiffs' copyright registration was approved by the U.S. Copyright Office.

138.     On March 5, 2021, almost five months after Plaintiffs sent the original cease and desist notice, Defendant Doyle responded, notifying Plaintiffs that he had no intention to stop his unlawful infringement of Plaintiffs' Work.

139.     The March 5, 2021 letter was followed swiftly by a response from Ms. Crededio on March 8, 2021, in which she claimed that she was the original author of "Untitled Wyoming Project" a.k.a. The Monarch and that any rights associated with the Work belonged to her as the owner and author.

## <u>COUNT ONE</u>

### (Declaratory Judgment Pursuant to 28 U.S.C. §§ 2201 re Rights of "Untitled Wyoming Project" a.k.a. The Monarch)

140.     Plaintiffs repeat and reallege paragraphs 1-56 above as if set forth fully herein.

141.     An actual, ripe and justiciable controversy exists among the parties regarding their respective owner and authorship rights concerning the Work.

142.     Ms. Credidio's contributions to the Work were on a work for hire basis.  Mr. Doyle did not make any meaningful contributions to the Work.  Neither Defendant can establish that their copyright registrations are valid.

143.    Plaintiffs are entitled to a declaration that the copyright registrations held by Ms. Crededio and Mr. Doyle respectively are invalid.

144.    Plaintiffs are also entitled to a declaration that their copyright registration is valid, and Plaintiffs are therefore the exclusive owners and authors of the Work.

## COUNT TWO

### (Copyright Infringement by Cassi Crededio Concerning "Untitled Wyoming Project" a.k.a. The Monarch)

145.    Plaintiffs repeat and reallege paragraphs 1-61 above as if set forth fully herein.

146.    Plaintiffs are the owners of a valid copyright of "Untitled Wyoming Project" a.k.a. The Monarch, Registration Number PAu004057984..

147.    Ms. Credidio copied Plaintiffs' original expression from the copyrighted work when she submitted her application for a copyright to the U.S. Copyright Office.

148.    Ms. Crededio's November 19, 2019 copyright registration of "Untitled Wyoming Project" a.k.a. The Monarch in which she falsely records herself as the Work's owner and author infringed on Plaintiffs exclusive copyright rights concerning "Untitled Wyoming Project" a.k.a. The Monarch.

149.    The continued refusal to cancel the November 19, 2019 copyright registration after being given notice by Plaintiffs that such refusal infringes on Plaintiffs' exclusive rights constitutes willful infringement of Plaintiffs' rights of exclusive acts concerning the Work under 17 U.S.C. § 106.

## COUNT THREE

### (Copyright Infringement by Kevin Doyle Concerning "Untitled Wyoming Project" a.k.a. The Monarch)

150.    Plaintiffs repeat and reallege paragraphs 1-66 above as if set forth fully herein

151.    Plaintiffs are the owners of a valid copyright of "Untitled Wyoming Project" a.k.a. The Monarch, Registration Number PAu004057984.

152.    Mr. Doyle copied Plaintiffs' original expression from the copyrighted work when he submitted his application for a copyright to the U.S. Copyright Office and when he pitched the Work to talent agencies, including "Zero Gravity Management."

153.    Mr. Doyle's October 9, 2020 of copyright registration Wonderland: The Equality State which is based off of "Untitled Wyoming Project" a.k.a. The Monarch where he falsely records himself as the works owner and author infringed on Plaintiffs exclusive copyright rights.

154.    Mr. Doyle's attempts to pitch "Untitled Wyoming Project" a.k.a. The Monarch to talent agencies including "Zero Gravity Management" infringed on Plaintiffs' exclusive copyright rights.

155.    The continued refusal to cancel the October 9, 2019 copyright registration, and cease the pitching of "Untitled Wyoming Project" a.k.a. The Monarch to talent agencies after being given notice by Plaintiffs that such refusal infringes on Plaintiffs' exclusive rights constitutes willful infringement of Plaintiffs' rights of exclusive acts concerning the Work under 17 U.S.C. § 106.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demands judgment against Defendants as follows:

A.    For a judgment declaring (a) that the copyright registrations held by Ms. Crededio and Mr. Doyle respectively are invalid and (b) that Plaintiffs' copyright registration is valid and that Plaintiffs are therefore the exclusive owners and authors of "Untitled Wyoming Project" a.k.a. The Monarch .

B.    Finding that Defendant Crededio has infringed on Plaintiffs exclusive rights by filing her own registration of "Untitled Wyoming Project" a.k.a. The Monarch with the U.S. Copyright Office.

C.    Finding that Defendant Doyle has infringed on Plaintiffs exclusive rights by filing his own registration based off "Untitled Wyoming Project" a.k.a. The Monarch with the U.S. Copyright Office, and attempting to pitch the work to various talent agencies.

D.    For attorneys' fees and costs;

E.    Such other and further relief as the Court deems just, equitable, and proper.


## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated:   July 28, 2022

**GRANT & EISENHOFER P.A.**

*/s/ Caitlin M. Moyna*
Jay W. Eisenhofer
Caitlin M. Moyna (Admitted - Bar No. 3278)
Thomas Walsh
485 Lexington Avenue
New York, New York 10017
jeisenhofer@gelaw.com
cmoyna@gelaw.com
twalsh@gelaw.com
*Counsel for Plaintiffs*