## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CHRISTOPHER GENTILE, and JUAN A. CRAWFORD.

                              Plaintiffs,

v.

 KEVIN DOYLE


                              Defendant.

Case No. 1:21-cv-08528 (LTS)(OTW)

**JURY TRIAL REQUESTED**

**PLAINTIFFS' SECOND AMENDED COMPLAINT**

Christopher Gentile and Juan A. Crawford (together, "Plaintiffs"), states as follows:

1.      Plaintiffs bring this action against Mr. Kevin Doyle ("Defendant") for infringing on Mr. Gentile's and Mr. Crawford's copyright rights associated with their screenplay conceived as a television series and situated in the Western United States in the 1870s, called the "Untitled Wyoming Project" a.k.a. The Monarch ("Untitled Wyoming Project").

2.      There are several versions of the Untitled Wyoming Project relevant to the claims asserted herein. The first is a version of Untitled Wyoming Project that Plaintiffs co-authored with Cassi Crededio ("Ms. Crededio"). This version is referred to herein as the "Work." The second version is a version of Untitled Wyoming Project that Plaintiffs solely authored after Ms. Crededio ceased working on the Work. This version is referred to herein as the "Derivative Work."

3.      This action arises from Mr. Doyle's unauthorized registrations of early versions of both the Work and the Derivative Work with the United States Copyright Office (the "U.S. Copyright Office") without the explicit authorization of Mr. Gentile, Mr. Crawford and Ms. Crededio. In addition, Mr. Doyle has attempted to claim the Derivative Work, the contents of which were authored solely by the Plaintiffs, as his own.

4.    Mr. Gentile, Mr. Crawford and Ms. Crededio are the exclusive co-authors of the Work.  Mr. Gentile and Mr. Crawford are the exclusive authors of the Derivative Work, which Plaintiffs derived from the Work they co-authored with Ms. Crededio.  At times, Mr. Doyle assisted Plaintiffs in drafting the Derivative Work, but Plaintiffs never relinquished control over the direction, scope and words of the Work, and any contributions made by Defendant were not independently copyrightable.

5.    Ms. Crededio was not involved in Plaintiffs' sole authorship of their Derivative Work. Ms. Crededio's authorship claims are only as to the original Work she co-authored with Plaintiffs which contains Untitled Wyoming Project's opening acts.

6.    Ms. Crededio's relationship with Plaintiffs began on or about October 14, 2019 to assist in the drafting of the opening acts of the Work. She entered into a written agreement on October 22, 2019, in which she agreed that she would not disclose the Work to any third party.

7.    It was made clear to Ms. Crededio that she was brought on to assist in contributing to the drafting of the Work as well as to incorporate Plaintiffs' verbal instructions, written outlines, and rough drafts into the Work.  Ms. Crededio's written contributions were made in lock-step with Plaintiffs' contributions, and together their work product melded together to form the opening acts of the Work.   To the extent that Ms. Crededio is considered the author of any portion of the Work, that authorship is in tandem with Plaintiffs' contributions to the Work's opening Acts.   As compensation for the portions of the Work's opening acts authored by Ms. Crededio, Plaintiffs paid Ms. Crededio a sum of $500 for each act she completed.

8.    Following completion of a draft of the opening acts of the Work, and without consulting Plaintiffs, Ms. Crededio applied to register the Work with the U.S. Copyright Office on November 15, 2019, which was later granted. In filing her registration with the U.S. Copyright

Office, Ms. Crededio incorrectly listed herself as the Work's sole author and failed to list Plaintiffs as co-authors of the Work.   Plaintiffs were unaware of Ms. Crededio's filing of her copyright registration which omitted Plaintiffs as co-authors until they discovered Ms. Crededio's registration almost a year later, in October of 2020. Because Ms. Crededio did not list Plaintiffs as co-authors, the copyright she obtained was invalid.

9.     On or around November 2, 2019, Ms. Crededio had a falling out with Plaintiffs over the speed at which Ms. Crededio's contributions to the opening acts of the Work were being drafted. Plaintiffs and Ms. Crededio were unable to reconcile their differences and Ms. Crededio ceased to contribute to the Work after November 2, 2019.

10.     Following Ms. Crededio's departure, Plaintiffs continued to revise and adapt the Work, which ultimately resulted in Plaintiffs creating and authoring the Derivative Work. The Derivative Work was a fully revised and edited script derived from the Work Plaintiffs and Ms. Crededio co-authored.

11.     Around the time Ms. Crededio ceased her working relationship with Plaintiffs, Mr. Doyle, due to his close friendship with Mr. Gentile, was allowed to oversee the continued adaptation of the Untitled Wyoming Project, and gain insight as to how a script in the screenwriting industry was formulated.

12.     During Mr. Doyle's relationship with Plaintiffs, through which he was allowed to oversee the continued progress of the Untitled Wyoming Project, and assist in making contributions to Plaintiffs' Derivative Work, Mr. Doyle stole Plaintiffs solely authored Derivative Work and submitted a copied version which Mr. Doyle named "WONDERLAND: *The Equality State*" bearing the registration number PAu004052332 with the U.S. Copyright Office, listing himself as the work's sole author.

13.     Mr. Doyle's filing of his own copyright of "WONDERLAND: *The Equality State*", which is either an identical version of Plaintiffs' Derivative Work, or another derivative thereof, was done so without the authorization of Plaintiffs. There is also no evidence to suggest that Ms. Crededio ever granted Mr. Doyle permission to file a copyright registration that was derived from the Work Plaintiffs and Ms. Crededio co-authored. Even in the event that Ms. Crededio did provide Mr. Doyle with permission to produce a derivative work from the version of Untitled Wyoming Project she co-authored, that permission did not give Mr. Doyle the authority to copy the derivative version of script that was authored solely by Plaintiffs and represent it as his own.

14.     By applying for copyrights concerning the Derivative Work based on false premises, Mr. Doyle has infringed Plaintiffs' exclusive copyright rights as it pertains to the Derivative Work.  Plaintiffs are entitled to a declaration that they and Ms. Crededio are the exclusive owners and authors of the Work and that Plaintiffs are the sole owners and authors of their Derivative Work which was subsequently copied by Mr. Doyle and registered with the U.S. Copyright Office through three different applications.

## **PARTIES**

15.     Plaintiff Christopher Gentile is a United States citizen residing in New York, New York.  Mr. Gentile originally conceived of the idea for "Untitled Wyoming Project," and is one of the authors of both the Work and the Derivative Work at issue here.

16.     Plaintiff Juan A. Crawford is a United States citizen residing in New York, New York.  Together with Mr. Gentile, Mr. Crawford co-authored and created the Work with Ms. Crededio.  On or about July 11, 2019, Mr. Crawford registered "Untitled Wyoming Project" with the Writers Guild of America ("WGA") before either Ms. Crededio or the Defendant was involved with the Work and Derivative Work and before any other registration had been filed.

17.    Defendant Kevin Doyle is an individual who resides in New York, New York. Defendant Doyle was allowed by Plaintiffs to oversee "Untitled Wyoming Project". In light of their twenty-year friendship, Mr. Gentile offered Mr. Doyle the opportunity to work on "Untitled Wyoming Project" as a courtesy to give Mr. Doyle experience in the screen writing industry. Mr. Doyle's involvement with "Untitled Wyoming Project" rests solely with his minimal contributions to Plaintiffs' Derivative Work.

18.    To be clear, Mr. Doyle made no independently copyrightable contributions to the Work that was co-authored by Plaintiffs and Ms. Crededio, which was registered with the U.S. Copyright Office by Ms. Crededio in or around November 15, 2019.

## NON-PARTIES

19.    Cassi Crededio is an individual who resides in Wood Dale, IL. Ms. Crededio worked with Plaintiffs to author the first three acts of Untitled Wyoming Project. Ms. Crededio had a working relationship with Plaintiffs from October 14, 2019 through November 2, 2019. All contributions to the Work and its subsequent iterations, that were incorporated after November 2, 2019 were implemented and authored solely by the Plaintiffs. Ms. Crededio's authorship of the Work extends only to the version of the work attached as Exhibit A which clearly presents Plaintiffs and Ms. Crededio as the Work's authors.

## JURISDICTION AND VENUE

20.    This is an action for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202, and for copyright infringement in violation of the copyright laws of the United States, 17 U.S.C. § 101 et seq., including 17 U.S.C. § 411(a).

21.    This Court has subject matter jurisdiction of this action pursuant to the Copyright Act and the Judicial Code, 28 U.S.C. §§ 1331 and 1338(a).

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1400(a) because Plaintiffs and Defendant reside in this District and because the injury caused by the acts alleged in this Second Amended Complaint was felt in this District.

23.     This Court has personal jurisdiction over the Defendant pursuant to New York C.P.L.R. §§ 302(a) and/or 301.

## FACTS

### A.    PLAINTIFFS ORIGINALLY CONCEIVE THE IDEA FOR THE WORK

24.     The idea for Untitled Wyoming Project first came to Mr. Gentile fifteen years ago. He was discussing some of the hit shows of the day with a director from the long running NBC show, Law and Order.  In particular, Mr. Gentile and this director remarked that there were several high-quality shows centered around the "flawed hero" model, specifically, Tony Soprano in The Sopranos and Don Draper in MadMen.  Mr. Gentile noted that there was no similar "flawed hero" entertainment that focused on a strong female lead.  The Law and Order director expressed his view that this was not likely to happen.

25.     Mr. Gentile believed in his idea, however, and looked for opportunities to create a drama focused around a flawed female heroine.  Several years later, he learned that Wyoming was the first state or territory in the nation to grant suffrage to women, in 1869.  He also learned that these rights were made possible by the influence of the madams in that territory, who ran houses of prostitution that serviced, among others, the mining communities in the area.  The genesis for "Untitled Wyoming Project" was born.

26.     Mr. Gentile and Mr. Crawford have been long-time friends and colleagues.  Both studied at the prestigious William Esper Studio in Manhattan, which is often listed among the 25 best drama schools for a Master of Fine Arts in the nation.  In 2019, Mr. Gentile discussed his idea

for a period drama set in the late 1800's American West, and focusing on a madam who ran a brothel, but also championed women's rights.

27.    Mr. Gentile and Mr. Crawford together conducted extensive research into this unique historical period so that they could begin to develop a script for a television series focused on the role that madams of brothels in the American West played in bringing suffrage rights to women.  As part of their research, they consulted the following texts: "A Renegade History of the United States", by Thaddeus Russell; "The Lost Sisterhood: Prostitution in America 1900-1918", by Ruth Rosen; "Rocky Mountain West: Colorado, Wyoming, & Montana 1859-1915", by Duane A. Smith; "Daughters of Joy, Sisters of Misery: Prostitutes in the American West 1865-90", by Anne M. Butler; "Buffalo Bill's America: William Cody and the Wild West Show", by Louis S. Warren; "Wicked Women: Notorious, Mischievous and Wayward Ladies from the Old West", by Chris Enss; "A Curious History of Sex", by Kate Lister; "Soiled Doves: Prostitution in the Early West", by Anne Seagraves; "Brothels, Bordellos, & Bad Girls: Prostitution in Colorado 1860-1930", by Jan MacKell; "Outlaw Tales of the Old West", by Erin Turner; "The Great Wyoming Whorehouses", a Historic Chronicle, by Tom Lawrence; and "Red Light Women of the Rocky Mountains", by Jan Mackell.

28.    Armed with this research and their ideas, Mr. Gentile and Mr. Crawford began to draft the early versions of Untitled Wyoming Project.  Mr. Crawford wrote a first draft of the first few scenes of Untitled Wyoming Project and submitted this version of the Work to the Writers Guild of America ("WGA").  These first pages of the "Untitled Wyoming Project", as filed with the WGA, formed the underlying basis for all subsequent versions and derivations.

### B.    Ms. Crededio's  Relationship with Plaintiffs Leads to Her Co-authoring the Work's Opening Acts

29.    Ms. Crededio met Mr. Crawford through her father, who had worked as a sound and lighting crewmember on a project where Mr. Crawford had an acting role.  Ms. Crededio was on set occasionally with her father.  At one point, she was speaking with Mr. Crawford and mentioned that she was an aspiring writer.  Mr. Crawford remarked that he and Mr. Gentile were looking for assistance with fleshing out some of their original ideas into a working script. Plaintiffs had the idea, vision, and early drafts of the Work developed, but thought bringing on another author who would provide written contributions alongside their own, would aid in the efficient development of the plot lines, characters, dialog and scenes they had mentally conceived.

30.    Ms. Crededio did not have any professional credits to her name, and this would be a way for her to take part in co-authoring an original piece with Plaintiffs, as well as the added benefit of monetary compensation for her contributions to the Work.  From the onset Ms. Crededio was aware that her relationship with Plaintiffs was a collaborative one, through which they would both make written contributions to the Work. In November of 2019, during a conversation between Mr. Crawford and Ms. Crededio regarding Ms. Crededio's prior experience in the screen writing industry, Ms. Crededio acknowledged that the drafting of the Work was made up of collaborative contributions stating  "this collaboration has been huge for me.  I have put much focus into it and am extremely thankful for the opportunity."

31.    On October 22, 2019, Ms. Crededio entered into a written Confidentiality Agreement with Mr. Gentile ("Confidentiality Agreement") in order to protect Plaintiffs' original intellectual property, and to ensure that Plaintiffs and Ms. Crededio would not divulge any aspects of the Work until a finalized adaption of Untitled Wyoming Project was ready to be sold.  Pursuant to the Confidentiality Agreement, Ms. Crededio agreed that she would "treat all Confidential

Information in the strictest confidence and shall not use such Confidential Information for any purpose other than [her] work on the Project."  "Confidential Information" is defined as "[a]ny and all information and materials relating to Untitled Wyoming Project/Soiled Doves/Wild Country Production (the 'Project'), Juan Antonio Inc. and any of its affiliates . . . including, without limitation, scripts, program footage and elements, dailies, working and final cuts, digital media, visual effects, and photographs."  These materials are deemed "confidential and proprietary" to Juan Antonio Inc., Mr. Crawford's production company.

32.    During the course of her working relationship with Plaintiffs, Ms. Crededio, along with Plaintiffs helped co-author the Work.

33.     Ms. Crededio's working relationship with Plaintiffs lasted approximately three weeks, from October 14, 2019 through November 2, 2019.  During this time, Ms. Crededio provided written contributions to the Work, alongside the written contributions made by Plaintiffs, which in tandem formulated the Work which Ms. Crededio registered with the U.S. Copyright Office in or around November 15, 2019

34.    In addition to co-authorship credit as indicated on the cover page of the Work, attached as Exhibit A, which lists both Plaintiffs and Ms. Crededio as the Work's writers, Ms. Crededio was also paid a sum of $500 for each act she drafted.  During her time spent on the work, Ms. Crededio was given explicit instructions by Mr. Gentile and Mr. Crawford with regard to: creation of characters, descriptions of scenes, development of themes, and specific dialog, which shows that while the parties co-authored the script, Plaintiffs always maintained ultimate decision-making authority.

35.    Ms. Crededio, along with Plaintiffs, used a screenwriting software and a platform called "WritersDuet."  The program is designed to be collaborative and allows writers to "co-write

in real time". https://www.writerduet.com.  Through this method Plaintiffs at all times had access

to the Untitled Wyoming Project script, and could see and comment on any changes Ms. Crededio

made to any individual scene. While WritersDuet allowed Plaintiffs and Ms. Crededio to co-write

in real time, Plaintiffs still had ultimate control over the direction the Work. This allowed Plaintiffs

to mold Ms. Crededio's contributions along with their own into a final product that ultimately

resulted in the Work attached as Exhibit A. Throughout the collaborative process, in addition to

their own written contributions Plaintiffs made suggestions to Ms. Crededio's contributions,

sometimes advising ways that they could be re-written and in turn Plaintiffs elicited feedback from

Ms. Crededio concerning her thoughts on her written contributions as well as the overall direction

of the Work.

36.     Unfortunately, Ms. Crededio and Plaintiffs relationship deteriorated following a

dispute concerning the ability of the parties to meet certain drafting deadlines which would ensure

a streamlined process to a final draft of the Work. After contributing to three acts of the script,

Plaintiffs and Ms. Crededio parted ways. As part of her agreement with Plaintiffs, Ms. Crededio

was paid a sum of $500 for her contributions to each completed act.

### C.     UNTITLED WYOMING PROJECT HAS GONE THROUGH MULTIPLE ITERATIONS SINCE MS. CREDEDIO STOPPED CONTRIBUTING TO THE WORK AS A CO-AUTHOR

37.     Mr. Gentile and Mr. Crawford are the creators of "Untitled Wyoming Project." Ms.

Crededio was originally brought on to implement drafting contributions, in addition to the

contributions made by Plaintiffs, to the first version of the Work. Since Ms. Crededio ceased

contributing to the Work with Plaintiffs, "Untitled Wyoming Project" has gone through many

adaptations and permutations, and as of the filing of this Second Amended Complaint, is still not

finished.

38.     To avoid confusion, Exhibit A to this Second Amended Complaint is a copy of the version of the script which was co-authored by Plaintiffs and Ms. Crededio as it existed when Ms. Crededio ceased her collaborative relationship with Plaintiffs and the Work on or about November 2, 2019, and since that date the Work has been maintained by Plaintiffs.  The version Ms. Crededio submitted for copyright protection is either identical to Exhibit A, or is a derivative thereof which contains Plaintiffs copyrighted contributions.

39.     Plaintiffs' claims against Mr. Doyle arise from his unauthorized attempts to sell Plaintiffs' Derivative Work which was authored solely by the Plaintiffs after Ms. Crededio had ceased working on Untitled Wyoming Project. Plaintiffs registered the Derivative Work with the U.S. Copyright Office on November 27, 2020. A copy of the Derivative Work is attached to this Second Amended Complaint as Exhibit B. Upon informative and belief Mr. Doyle's copyright registration bearing the registration number PAu004052332 and entitled "WONDERLAND: *The Equality State*" is identical to the Derivative Work attached as Exhibit B, or is a derivative thereof. Furthermore, upon information and belief Mr. Doyle's copyright registrations bearing the registration numbers PAu004110648, entitled "Untitled Wyoming Project: Plot Synopsis & Character Breakdowns", and PAu004054496, entitled "8:46 and 9 Other Unpublished Works" are registrations that contain Plaintiffs' independently copyrightable material and are further derivatives of Plaintiffs' solely authored Derivative Work.  Mr. Doyle's registrations of PAu004052332, PAu004110648, and PAu004054496, were done so without the authorization of Plaintiffs. There is no agreement in place between Ms. Crededio and Mr. Doyle creating a non-exclusive license for Mr. Doyle to use the copyrighted material contained within the Work co-authored by Plaintiffs and Ms. Crededio.

40.     Plaintiffs originally conceived the idea for the "Work" and memorialized their ideas in writing in a draft version of opening dialog.  Mr. Crawford submitted this version of the Work to the Writers Guild of America ("WGA"). These first pages of the Work, as filed with the WGA, were the genesis of the Work, and the underlying basis for all subsequent versions and derivations.

41.     Plaintiffs along with Ms. Crededio then developed the WGA submission into a draft of their screenplay.  Ms. Crededio's contributions to the Work are only related to Work's first few acts as outlined in Exhibit A. The Derivative Work and the subsequent iterations thereof were developed post Ms. Crededio's working relationship with Plaintiffs and were authored solely by Plaintiffs.

42.     Additionally, any derivate work that Mr. Doyle authored on his own and filed with the U.S. Copyright which was based on either 1) the Work, co-authored by Plaintiff and Ms. Crededio, or 2) the Derivative Work, was done so without authorization of Plaintiffs.

43.     There is no evidence indicating that Ms. Crededio granted Mr. Doyle a non-exclusive license permitting him to use her contributions to the Work she co-authored with Plaintiffs. If such a non-exclusive license does exist there is no evidence suggesting the scope of that licensing agreement entitled Mr. Doyle to register any work product derived from the Untitled Wyoming Project with the U.S. Copyright Office. Absence of an agreement existing before Mr. Doyle submitted his applications to the U.S. Copyright Office should invalidate Mr. Doyle's copyright registrations, because neither Plaintiffs nor Ms. Crededio authorized Mr. Doyle to use any iteration of Untitled Wyoming Project. Mr. Doyle and Ms. Crededio cannot retroactively create a non-exclusive licensing agreement or an agreement transferring Ms. Crededio's authorship rights to Mr. Doyle simply because the parties disagree as to authorship credit.

### D. PLAINTIFFS ARE THE CO-AUTHORS OF THE VERSION OF THE WORK THAT MS. CREDEDIO SUBMITTED FOR COPYRIGHT PROTECTION

44.     Ms. Crededio was hired by Plaintiffs to assist in writing the Work's first three acts. Ms. Crededio's contributions to the Work was in tandem with Plaintiffs' contributions with the intention that both parties' contributions be merged into a collective work. This is evidenced by the Work Ms. Crededio registered with the U.S. Copyright Office displaying both Plaintiffs and Ms. Crededio as the writers of the Work. *See* Exhibit A. As such, and as described below Plaintiffs authored a significant portion of the Work.

45.     Plaintiffs have attached as Exhibit A the version of the Work as it existed at the end of Ms. Crededio's collaborative relationship with Plaintiffs.  Plaintiffs provide a detailed explanation on a scene-by-scene basis of portions of the Work where they implemented written contributions.

### 1. Act I, Scene 1.

46.     Act I, Scene 1 of the Work vividly describes the main character of the Work, "Travis Wayne".  Plaintiffs specifically authored every aspect of "Travis Wayne's" character, including his name, personal description, wardrobe, and the overall direction surrounding the events occurring in Act 1; Scene 1.  *See* Exhibit A, pp 2-3.  Plaintiffs also named and drafted the character description of "Brother Whip".  *Id.*  Finally, Plaintiffs were responsible for the action and overall dialog in Act 1: Sc 1.  This includes the events surrounding "Wayne's" acceptance of a package with a branded "M" on it.  As a full reading of the pilot script reveals, the package with the branded "M" on it is a central plot point to the pilot script, and Ms. Crededio had no input with regard to this plot point.

**2.    Act I, Scene 2: Rock Springs. Coal Camp. Night Fall.**

47.    Act I, Scene 2 involves a description of a coal mining camp.  Plaintiffs were responsible for the description of the coal mining camp.  Plaintiffs also created the character "Mining Man 1". *See* Exhibit A, pages 3-4.

**3.    Act I, Scene 3: Int. Log Cabin. Night.**

48.    Act I, Scene 3 follows the actions of the "Knights of Labor" characters concerning both the characters of the "Knights" and the "Leader".  Plaintiffs authored the action, description and dialog of this entire scene surrounding the "Knights of Labor". *See* Exhibit A, pages 4-6.

**4.    Act I, Scene 4: Int. Saloon. Night.**

49.    Act I, Scene 4 follows the action and dialog of the characters "Travis Wayne", "Jesse Love", and the "Bar Manager".  Here, Plaintiffs dictated all character descriptions as well as the actions and major dialog points associated with this scene, including the setting and the description of the two women who flirt with "Travis Wayne" as the scene progresses. *See* Exhibit A, pages 6-9.

**5.    Act I, Scene 5: Ext. Main Road. Seconds Later.**

50.    In scene 5 of Act I, Plaintiffs dictated and drafted all camera angles, characters, and actions associated with Scene 5. This includes the major dialog points between characters "Travis Wayne", "Jesse Love", and the "Bar Manager".  *See* Exhibit A, pages 9-11.

**6.    Act I, Scene 6: Int. Brothel. Madame's Office. Night.**

51.    In Act 1, Scene 6, Plaintiffs dictated the description, motivation, action and backstory of the characters "Madame" and "Mona".  Plaintiffs were also responsible for the specific wording of the dialog in this scene including but not limited to dictating the major plot

points of "Travis Wayne" agreeing to work for "Madam" and "Madame" branding "Travis Wayne". *See* Exhibit A, Pages 11-14.

### 7.     Act II, Scene 7: Int. Union Pacific Train Car. Moving. Morning.

52.     Plaintiffs' dictated  the overall setting of Act II, Scene 7, as well as the description, dialog, and backstory of the character "Thomas", including his motivations and actions. Plaintiffs also dictated the dialog surrounding the character "Driver" as well as the character "Walter Clark" including both characters description motivation and actions associated with Scene 7.  Plaintiffs were also responsible for dictating the major plot points in Scene 7.  *See* Exhibit A, Pages 14-15.

### 8.     Act II, Scene 8: Ext. Continuous.

53.     Plaintiffs dictated the setting of Act II, Scene 8. Plaintiffs were also responsible for the descriptions, actions, dialog and motivations of characters "Driver" and "Thomas" as it relates to Scene 8.  *See* Exhibit A, Page 15.

### 9.     Act II, Scene 9: Int. Office Headquarters. Day.

54.     Plaintiffs dictated the setting of Act II, Scene 9.  Plaintiffs were also responsible for the descriptions, actions, dialog and motivations of characters "Walter Clark" and "Thomas" as it relates to Scene 9.  *See* Exhibit A, Pages 15-18.

### 10.     Act II, Scene 10: Int. Rock Springs Coal Mine No. 6. Mid Afternoon.

55.     Plaintiffs dictated the setting of Act II, Scene 10 including the descriptions of "Mona's Room" and the "Brothel" as well as the descriptions actions, dialog and motivations of the "Chinese Miner" characters. Plaintiffs also dictated and drafted the descriptions, actions, dialog and motivations of the character "White Miner/Foreman". In addition, Plaintiffs were also responsible for drafting the descriptions, actions, dialog, backstory and motivations for the character "Ben".  Plaintiffs were also the central driving force behind drafting the dialog and scene surrounding "Mona's pregnancy" which was the major plot in this scene. *See* Exhibit A, Page 20.

11.    **Act II, Scene 12: Brothel Dining Room. Moments Later.**

56.    Plaintiffs were responsible for dictating the overall setting in this scene as well as the descriptions, actions, dialog and motivations of characters "Jesse Love", "Travis Wayne", and "Chef". Plaintiffs also drafted all major plot points associated with Scene 12. *See* Exhibit A, Pages 21-22.

12.    **Act II, Scene 13: Int. Dove 2's Room. Moments Later.**

57.    Plaintiffs dictated the overall setting in Scene 13 as well as the descriptions, actions, dialog and motivations of the characters "Emma" and "Client 1". *See* Exhibit A, Pages 22-23 .

13.    **Act II, Scene 14: Brothel Dining Room. Moments Later.**

58.    Plaintiffs were responsible for drafting every component of Scene 14. *See* Exhibit A, Pages 23-25.

14.    **Act II, Scene 15: Int. Emma's Room. Moments Later.**

59.    Plaintiffs drafted all action and character dialog associated with Scene 15, including the descriptions of the "trap doors," the "doves," robbing the "client," and eventually getting caught. *See* Exhibit A, Pages 25-27.

15.    **Act III, Scene 16: Int. Brothel Dining Room. Moments Later.**

60.    Plaintiffs authored all characters in Scene 16, including their dialog, motivations and actions. Plaintiffs were also responsible for drafting the major plot of describing why the "doves" were robbing the "clients". *See* Exhibit A, Pages 28-30.

16.    **Act III, Scene 17: Brothel. Madame's Office. Night.**

61.    Plaintiffs created, named, and authored the character "Magistrate Grace", including her description, wardrobe, motivation and action associated with Scene 17. Plaintiffs also

exclusively drafted a majority of dialog of Scene 17 including the major plot point in this scene of Madame being taxed due to her businesses' recent success. *See* Exhibit A, Pages 30-33.

### 17.    Act III, Scene 18:  Int. Madame's Office. Moments Later.

62.    Plaintiffs were responsible for drafting every component of Scene 18. *See* Exhibit A, Pages 33-35.

### 18.    Act III, Scene 19:  Saloon Night.

63.    Plaintiffs authored Scene 19's setting as well as all aspects of every character within Scene 19.  Plaintiffs also authored the major action in this scene concerning the poker game between characters, as well as all certain aspects of the dialog between "Travis Wayne" and the "Bar Manager".  In particular, Plaintiffs were very particular about this dialog because it was important to show the audience the scope of Madame's power and influence over the fictional region in the late 1800s American West.  Plaintiffs also authored the dialog between "Travis Wayne" and "Thomas".  Finally, Plaintiffs authored all aspects of the creation of the character "Ruby", including her description, wardrobe, and dialog within this scene.  *See* Exhibit A, Pages 35-40.

### 19.    Act III Scene 21:  Int. Madame's Office. Next Day – Morning.

64.    Finally, Plaintiffs authored all elements of the dialog in Scene 21.  Plaintiffs also introduced and authored the character "Union Official Eugene Taylor" including all dialog, description, wardrobe, motivations, and actions associated with this character. *See* Exhibit A, Pages 42-45.

65.    As demonstrated in paragraphs 46-64 above, Plaintiffs are co-authors of the version of the Work that Ms. Crededio submitted to the Copyright Office. Ms. Crededio thus obtained a copyright under false pretenses.  Plaintiffs provided explicit instructions regarding what Ms.

Crededio should draft with regard to virtually every character, scene, string of dialog and plot point. Ms. Crededio's role was primarily to reduce to writing Plaintiffs' detailed instructions.

66. As further evidence of Plaintiffs' co-authorship of the Work, text messages confirm that Plaintiffs re-wrote much of the work Ms. Crededio had done and implanted their own written contributions. For example, on October 27, 2019, Mr. Crawford wrote to Ms. Crededio, "starting edits/rewrites from beginning then finish act 3 and into 4…" Ms. Crededio responded, "So is act 3 finished yet? If not I'll finish it tomorrow for new work week." Mr. Crawford responded, "No need, it will be shortly," indicating that he would finish writing Act 3, after rewriting Acts 1 and 2. Again on October 31, 2019, Mr. Crawford wrote, "Working through edit/rewrite and will be up to and finish act 3 by tomorrow."

67. On November 11, 2019, Mr. Crawford wrote to Ms. Crededio with regard to her work: "It is being edited and rewrites. [sic] Grammar has to be cleaned up and story need [sic] to tie together along with more dialogue and direction changes. The final script will not even be recognizable compared to the rough draft and that's kinda the point for it to be able to sell."

**E.    MS. CREDEDIO AGREED TO AND THEN VIOLATED A CONFIDENTIALITY AGREEMENT CONCERNING HER INVOLVEMENT WITH UNTITLED WYOMING PROJECT**

68. In connection with her collaborative relationship with Plaintiffs, Ms. Crededio agreed to and did sign a Confidentiality Agreement where she expressly agreed to protect all confidential information associated with "Untitled Wyoming Project" on October 22, 2019. Part of the reason Ms. Crededio agreed to sign the Confidentiality Agreement was due to her limited experience in the screenwriting industry, and her eagerness to co-author a written piece with Plaintiffs. At all times relevant to her working on the Work's Opening Acts, Ms. Crededio knew that her contributions were collaborative with Plaintiffs' contributions in formulating the completed work, making Ms. Crededio and Plaintiffs co-authors. As such Ms. Crededio was aware

that even though she was being brought on to write portions of the Work, the intellectual property authored by the parties was to be protected and not disclosed to any third-party for any purpose until a completed script was ready to be pitched.

69.    As part of the of the Confidentiality Agreement Ms. Crededio agreed as follows:

You agree that you shall treat all Confidential Information in the strictest confidence and shall not use such Confidential Information for any purpose other than your work on the Project.

You further agree that, without the Company's prior written consent, you shall not provide, duplicate, transmit, share, upload, or otherwise disclose, physically, digitally, verbally or in writing or otherwise, the Confidential Information to any third party in any form.  Being in unauthorized possession of or disseminating Confidential Information may subject you to immediate termination and also legal liability.

70.    On November 15, 2019, after finishing her collaborative relationship with Plaintiffs concerning the opening acts of "Untitled Wyoming Project," Ms. Crededio filed her own registration with the U.S. Copyright Office, but failed to list Plaintiffs as co-authors in her registration application. This omission was made despite the Work that Ms. Crededio is believed to have submitted to the U.S. Copyright Office listing Plaintiffs as co-authors of the Work.

71.    Ms. Crededio did not refute or ask for any alteration of any of the language provided in her confidentiality agreement before signing the agreement on October 22, 2019.

72.    Ms. Crededio never spoke with Plaintiffs before deciding to file her registration of Untitled Wyoming Project, in which she falsely represented that she was the sole owner and author of the work.  Her filing of her registration statement constituted a breach of the Confidentiality Agreement as well as fraud on the U.S. Copyright Office.

**F.    Ms. Crededio Willfully or Deliberately Failed to List Plaintiffs as Co-authors When She Registered the Work with the Copyright Office**

73.    Ms. Crededio committed fraud on the copyright office when she registered the Work with the Copyright Office on November 15, 2019.

74.    At all times during her collaborative relationship with Plaintiffs, Ms. Crededio knew that the Work they jointly authored contained independently copyrightable contributions made by Plaintiffs.  Nevertheless, Ms. Crededio intentionally omitted Plaintiffs' names as authors on the application she submitted to the Copyright Office, and either removed Plaintiffs' names from the Work prior to submitting it to the U.S. Copyright Office, or failed to include that information in her application.

75.    Ms. Crededio was aware that the Work contained contributions by Plaintiffs that were independently copyrightable because the Confidentiality Agreement she entered into with Plaintiffs expressly forbid her from divulging any "Confidential Information" associated with the Work to any third party.

76.    Ms. Crededio is not permitted to represent herself as the Work's sole author, and she does not have exclusive rights to the Work.

**G.    Mr. Doyle's Involvement in Untitled Wyoming Project**

77.    Mr. Gentile and Mr. Crawford have been friends for over twenty years.  During this time Mr. Gentile has routinely taken Mr. Doyle into his home, and assisted in Mr. Doyle's career aspirations whenever possible.  Unfortunately, on this occasion Mr. Doyle has taken advantage of Mr. Gentile's kindness as well as Plaintiffs' souring relationship with Ms. Crededio, and in the process has attempted to portray Plaintiffs' collaborative work with Ms. Crededio, and the Derivative Work Plaintiffs' authored solely thereafter, as his own.

78.     Plaintiffs offered Mr. Doyle the opportunity to work on "Untitled Wyoming Project" as a courtesy to give Mr. Doyle experience in the screen writing industry.

79.     Any and all, revisions, adaptions, or development of any of "Untitled Wyoming Project's" script, characters, scenes, setting, stage direction, or dialog contributed by Mr. Doyle were done at Plaintiffs' explicit direction.

80.     At no time did Mr. Doyle contribute any original work to the project. Mr. Doyle's entire claim to the "Untitled Wyoming Project" rests in the form of two draft scripts and a format bible where Mr. Doyle recorded all of his contributions.  None of these contributions were made independently of Plaintiffs' explicit direction.  Taking a previously transcribed work and copying it to a format bible does not grant Mr. Doyle authorship rights.  It was Plaintiffs (initially in collaboration with Ms. Crededio), who wrote and developed, the characters, themes and dialog associated with "Untitled Wyoming Project." Plaintiffs then further edited and revised the initial Work co-authored with Ms. Crededio into the Derivative Work which was solely authored by Plaintiffs.

81.      In a series of conference calls and "Whatsapp" exchanges between Plaintiffs and Mr. Doyle, Mr. Doyle repeatedly acknowledged that Plaintiffs are the true owners and sole authors of the Derivative Work, entitled "Untitled Wyoming Project".  Further, during these exchanges, Mr. Gentile routinely advised Mr. Doyle of changes that needed to be made to his drafting of portions of "Untitled Wyoming Project".

82.     Notably on April 28, 2020 (one day prior to Mr. Doyle sending his edits of the pilot script to Plaintiffs), Mr. Doyle sent Mr. Gentile the following message: "Dude you have the PILOT and the series trajectory your idea deserves. . . .[J]ump off the couch and scream out the fire escape window like that guy for the 1970's NETWORK movie." (emphasis added).

83.    On August 24, 2020 after receiving Mr. Doyle's edits in the form of a Format Bible, Mr. Gentile sent the following message: " I'd like to get on a call about some direction in the Bible that weren't discussed so that we can get on the same page."

84.    Thus, at all times during "Untitled Wyoming Project," Plaintiffs were the authors of the Work.  Any contributions that were added by Mr. Doyle were done so based either on previous works drafted by Plaintiffs or by Plaintiffs' explicit instruction.

**H.    PLAINTIFFS ARE THE AUTHORS OF THE DERIVATIVE WORK THAT MR. DOYLE CLAIMS AS HIS OWN**

85.    Attached as Exhibit B is the Derivative Work in the state that it was in when Mr. Doyle last worked on Untitled Wyoming Project.  As with the version that existed after Ms. Crededio severed ties with Plaintiffs, Plaintiffs are the sole authors of all derivative versions of the Work that were produced after Ms. Crededio ceased working on Untitled Wyoming Project. Thus, Plaintiffs specify below their authorship in drafting the version of the Derivative Work which was in their possession as it existed when they severed ties with Mr. Doyle. Plaintiffs contributions made up nearly the entirety, if not all of the contributions that ultimately resulted in the Derivative Work.

**1.    Vignette 01. Int. Home Outside of Laramie, Wyoming Territory (September 1870). Dawn.**

86.    Vignette 01 follows the action and dialog of the character "Louisa Swan".  Here, Plaintiffs dictated all character descriptions as well as the actions and major dialog points associated with this scene.  Plaintiffs were responsible for most of the drafting associated with Vignette 01 and provided their written work to Mr. Doyle in a series of "WhatsApp" messages. *See* Exhibit B, Page 1.

### 2. Scene 1: Ext. Rural Countryside, Wyoming Territory (Summer 1871). Dusk.

87.     Plaintiffs dictated the overall setting of Scene 1, as well as the description, dialog, and backstory of the character "Travis Sutler", including his motivations and actions. Plaintiffs also dictated the dialog surrounding the character "Tom Perkins". In addition, Plaintiffs dictated the opening credit images and music choice described in Scene 1. *See* Exhibit B, Pages 1-3.

### 3. Scene 2: Downtown Rock Springs, Wyoming. Int. Apartment. Morning.

88.     Plaintiffs dictated the overall setting of Scene 2, as well as the description, and dialog, "Madam", including her motivations and actions. Plaintiffs also dictated the dialog and action surrounding the character "Unnamed Man". *See* Exhibit B, Pages 4-5.

### 4. Scene 3: Downstairs of the Same Building. Int Saloon. Morning.

89.     Plaintiffs dictated the overall setting of Scene 3, as well as the description, and dialog of "Caroline", including her motivations and actions in Scene 3. *See* Exhibit B, Pages 5-6.

### 5. Scene 4: Ext. Outer Rock Springs, WY. Coal Camp. Evening.

90.     Plaintiffs dictated the overall setting of Scene 4, as well as the description, and dialog of "Mining Man 1", including his motivations and actions in Scene 4. *See* Exhibit B, Page 7.

### 6. Scene 5: Int. Cabin. Night.

91.     Here, Plaintiffs dictated the description and dialog of the character "Ex-Justice" including his wardrobe and motivations associated with Scene 5. *See* Exhibit B, Pages 7-9.

### 7. Scene 6: Int. Madame's Saloon. Night.

92.     Plaintiffs dictated the interior design of the "Saloon" in Scene 6. Plaintiffs were also responsible for the description and dialog of the characters "Emma", "Business Man 1",

"Business Man 2", "Ruby", and "Poker Player" including their motivations and action associated with Scene 6.  *See* Exhibit B, Pages 10-14.

### 8.    Scene 7: Ext. Streets of Rocks Springs, WY. Night.

93.    Plaintiffs dictated the action and setup associated with Scene 7.  Plaintiffs were also responsible for the dialog, motivation, and backstory of the character "Jesse Love" as it relates to Scene 7.  *See* Exhibit B, Pages 13-14.

### 9.    Scene 8: Int. Madame's  Saloon. Night.

94.    Plaintiffs dictated the motivation, backstory, and dialog of the character "Mona" as it relates to Scene 8.  Plaintiffs also dictated the action and motivation between characters "Travis", "Love", and "Caroline" in Scene 8.  *See* Exhibit B, Pages 14-17.

### 10.    Scene 9: Ext. Main Road. Seconds Later.

95.    Plaintiffs dictated scenery, action and dialog of the fight scene that commences in Scene 9.  Plaintiffs also dictated the motivation, backstory, and dialog of the character "Esther Morris" including her expository dialog with characters "Love" and "Travis" in Scene 9.  *See* Exhibit B, Pages 18-19.

### 11.    Scene 10: Int. Brothel. Madam's Office. Night.

96.    Plaintiffs dictated all components of Scene 10.  *See* Exhibit B, Pages 20-25.

### 12.    Scene 11: Int. Union Pacific Train Car. Moving. Morning

97.    Plaintiffs dictated all components of characters "Thomas" and "Driver" as it relates to Scene 11, including each character's background and wardrobe.  *See* Exhibit B, Page 26.

### 13.    Scene 13: Int. Mining Office Headquarters. Day.

98.    Plaintiffs dictated the setting of Scene 13. Plaintiffs also dictated all components of the character "Walter Clark" as it relates to Scene 13, including his dialog, backstory and motivation for Scene 13.  *See* Exhibit B, Pages 27-31.

### 14.    Scene 14: Int. Rock Springs Coal Mine No. 6. Mid Afternoon.

99.    Plaintiffs dictated the look and feel of all characters in Scene 14.  Plaintiffs also dictated each characters motivations, backstories and actions as it relates to Scene 14.  *See* Exhibit B, Pages 31-33.

### 15.    Scene 15: Int. Brothel. Evening.

100.    Plaintiffs dictated the wardrobe, motivations, actions and dialog of the characters "Emma", "Paris" and "Ben" as it relates to Scene 15.  *See* Exhibit B, Page 34.

### 16.    Scene 16: Int. Mona's Room. Moments Later.

101.    Plaintiffs dictated and created the characters "Ben" and "Mona" including each character's dialog, motivations and actions associated with Scene 16.  *See* Exhibit B, Pages 35-37.

### 17.    Scene 17: Int. Brothel Dining Room. Moments Later.

102.    Plaintiffs dictated all character components of Scene 17, including each character's, motivations, actions and dialog.  *See* Exhibit B, Pages 36-37.

### 18.    Scene 18: Int. Emma's Room. Moments Later.

103.    Plaintiffs dictated the action and setup of Scene 18 including the setup of the character "Client 1".  *See* Exhibit B, Pages 37-38.

### 19.    Scene 19: Int. Brothel Dining Room. Moments Later.

104.    Plaintiffs dictated all character components of Scene 19, including each character's motivations, actions and dialog.  *See* Exhibit B, Pages 38-39.

### 20.    Scene 20: Int. Emma's Room. Moments Later.

Plaintiffs dictated the action and setup of Scene 20 including the setup of the character "Client 1".  *See* Exhibit B, Pages 39-40.

**21.    Scene 21: Int. Brothel Dining Room. Moments Later.**

105.    Plaintiffs dictated all character components of Scene 21, including each character's motivations, actions and dialog.  *See* Exhibit B, Page 41.

**22.    Scene 22: Int. Brothel Dining Room. Moments Later. (Consecutive W/SC 20.**

106.    Plaintiffs dictated all character components of Scene 22, including each character's motivations, actions and dialog.  *See* Exhibit B, Pages 41-43.

**23.    Scene 23: Int. Brothel. Madame's Office. Night.**

107.    Plaintiffs dictated the dialog, motivations and actions of the characters "Madam" and "Morris" as they relate to Scene 23.  *See* Exhibit B, Pages 44-47.

**24.    Scene 24: Int. Madame's Office. Moments Later.**

108.    Plaintiffs dictated all components of the character "Love" in Scene 24, including his motivation and action.  *See* Exhibit B, Pages 47-48.

**25.    Scene 25: Saloon. Night.**

109.    Plaintiffs dictated all components of all characters in Scene 25, including each character's motivations, actions and dialog.  *See* Exhibit B, Pages 49-54.

**26.    Scene 26: Ext. Streets of Rock Springs. Same Night. – Late.**

110.    Plaintiffs dictated all components of character dialog, actions and motivations associated with Scene 26.  *See* Exhibit B, Page 55.

**27.    Scene 28: Int. Ruby's Room. Brothel. Same Night. – Late.**

111.    Plaintiffs dictated all components of Scene 28.  *See* Exhibit B, Pages 56-57.

**28.    Scene 29. Int. Madame's Office. Day After Next – Morning.**

112.    Plaintiffs created all characters in Scene 29, including each character's motivation, dialog and action.  Plaintiffs also drafted the introduction of the character "Governor" including his motivation and dialog.  *See* Exhibit B, Pages 58-63.

29.     **Scene 30. Ext. Mining Office Headquarters – Morning.**

113.    Plaintiffs dictated the motivations, actions and dialog for the characters "Thomas" and "Walter" as it relates to Scene 30.  *See* Exhibit B, Pages 63-64.

30.     **Scene 31. Int. Brothel Dining Room – Afternoon.**

114.    Plaintiffs dictated all components of each character in Scene 31, including each character's motivations, actions and dialog.  *See* Exhibit B, Pages 64-65.

31.     **Scene 32. Ext. Brothel. Rock Springs, WY. – Early Evening, Dusk.**

115.    Plaintiffs dictated all components of each character in Scene 32, including each characters' motivations, actions and dialog.  *See* Exhibit B, Pages 66-68.

32.     **Scene 33. Ext. Streets / Alleys of Rock Springs – Evening, Dusk (Consecutive W/ SC  32).**

116.    Plaintiffs dictated all aspects associated with the murder of the character "Ex-Justice" in Scene 33.  *See* Exhibit B, Page 69.

33.     **Scene 34. Ext. Train Tacks Outside Rock Springs. Night.**

117.    Plaintiffs dictated all aspects associated with the destruction of the train which occurs in Scene 34.  *See* Exhibit B, Pages 69-70.

I.    **MR. DOYLE ATTEMPTS TO PORTRAY UNTITLED WYOMING PROJECT AS HIS OWN WORK**

118.    Over the course of the Spring and Summer of 2020, Plaintiffs spent valuable time providing screenwriting mentorship to Mr. Doyle.

119.    Repeatedly throughout this process, Mr. Doyle inquired about submitting "Untitled Wyoming Project" to various entertainment companies.  Each time this issue was discussed, the Plaintiffs informed Mr. Doyle that the project was nowhere near ready to be pitched to any agency.

120.    Despite Plaintiffs informing Mr. Doyle, on multiple occasions, that they had no interest in pitching their project in its current state, without permission or authority, Mr. Doyle

independently pitched the Work to the entertainment company Zero Gravity Management ("Zero Gravity").

121.    During this pitch Mr. Doyle falsely represented himself as one of the authors of "Untitled Wyoming Project".  This falsehood led Zero Gravity to request subsequent materials concerning the production of "Untitled Wyoming Project" from Mr. Doyle, and for all creative parties to sign release forms.

122.    Knowing that Mr. Gentile and Mr. Crawford were the rightful authors and owners of "Untitled Wyoming Project", and that any deal could not commence without releases from both Plaintiffs, Mr. Doyle approached Plaintiffs to discuss the "opportunity" of signing with Zero Gravity.

123.    Upon learning that Mr. Doyle had secretly approached Zero Gravity and falsely portrayed Untitled Wyoming Project", as his own work product, Plaintiffs realized that Mr. Doyle's intention was to steal their work product for his own gain.  After this interaction, Plaintiffs ceased associating with Mr. Doyle.

124.    On October 10, 2020 Plaintiffs learned that Mr. Doyle had applied for, and been granted, a registration of the Work with both the WGA and the U.S. Copyright Office.  In Mr. Doyle's registration to the U.S. Copyright Office he asserted himself as the owner and author of Episode 2 of "Untitled Wyoming Project", a project he entitled "Wonderland: *The Equality State*".

125.    Mr. Doyle's October 9, 2020 registration with the U.S. Copyright Office lists Ms. Crededio as providing Mr. Doyle with permission to file his registration under the "Rights and Permission" section of the registration.

126.    Thus, unbeknownst to Plaintiffs, Ms. Crededio allegedly granted Mr. Doyle permission to create a derivative script based on the Work that she co-authored with Plaintiffs.

127.    Upon information and belief, Mr. Doyle copied the Derivative Work Plaintiffs created and then registered it with the U.S. Copyright Office under three separate copyrights. Plaintiffs believe that the copyright registration bearing the registration number PAu004052332 and entitled "WONDERLAND: *The Equality State*" is identical to the Derivative Work attached as Exhibit B, or is a derivative thereof. Furthermore, upon information and belief, Mr. Doyle's copyright registrations bearing the registration numbers PAu004110648, entitled "Untitled Wyoming Project: Plot Synopsis & Character Breakdowns", and PAu004054496, entitled "8:46 and 9 Other Unpublished Works" are registrations that contain Plaintiffs' independently copyrightable material.

### J.    PLAINTIFFS FILE THEIR OWN COPYRIGHT REGISTRATIONS TO PROTECT THEIR OWNERSHIP AND AUTHORSHIP INTERESTS IN THE WORK

128.    Once Plaintiffs were made aware of the registrations filed by both Defendant and Ms. Crededio, they immediately sent Mr. Doyle a cease and desist letter on October 19, 2020, asking that Mr. Doyle cease his unlawful infringement of Mr. Gentile and Mr. Crawford's Work. Plaintiffs had hoped notifying Mr. Doyle of his infringement on Plaintiffs' work would put an end to the dispute.

129.    After waiting over a month with no response from Mr. Doyle, Plaintiffs applied for their own copyright registration on November 27, 2020.  The U.S. Copyright Office granted such copyright for the dramatic work and music "Untitled Wyoming Project" a.k.a. Monarch, and assigned the Registration Number PAu004057984. Upon learning of the Defendant's registrations, Plaintiffs felt it necessary to file their own copyright registrations in order to protect interests in both the Work and the subsequent Derivative Work.

130.    In January of 2021, Plaintiffs' copyright application for the work "Untitled Wyoming Project" a.k.a. The Monarch was approved and registered by the U.S. Copyright Office.

**K.    PLAINTIFFS GAVE MR. DOYLE MULTIPLE OPPORTUNITIES TO CEASE HIS UNLAWFUL INFRINGEMENT OF "UNTITLED WYOMING PROJECT" A.K.A THE MONARCH**

131.    From October 10, 2020, the date the Plaintiffs first learned of Defendant's copyright registrations, through the filing of this complaint, Plaintiffs have given Mr. Doyle opportunities to cease his unlawful infringement of Plaintiffs' work.

132.    On October 19, 2020, Plaintiffs sent Mr. Doyle a cease and desist letter notifying him that his copyright registration was made under false pretenses as he was not the author of "Untitled Wyoming Project" a.k.a. The Monarch or any work derived therefrom.

133.    On November 25, 2020, Plaintiffs sent a similar cease and desist letter to Ms. Crededio which notified Ms. Crededio that her November 11, 2019 copyright registration was made under false pretenses as she was not the sole author of "Untitled Wyoming Project" a.k.a. The Monarch.

134.    In January of 2021, Plaintiffs' copyright registration was approved by the U.S. Copyright Office.

135.    On March 5, 2021, almost five months after Plaintiffs sent the original cease and desist notice, Defendant Doyle responded, notifying Plaintiffs that he had no intention to stop his unlawful infringement of Plaintiffs' Work.

136.    The March 5, 2021 letter was followed swiftly by a response from Ms. Crededio on March 8, 2021, in which she claimed that she was the original and sole author of "Untitled Wyoming Project" a.k.a. The Monarch and that any rights associated with the Work belonged to her as the owner and author.

## COUNT ONE

**(Declaratory Judgment Pursuant to 28 U.S.C. §§ 2201 re Rights of "Untitled Wyoming Project" a.k.a. The Monarch)**

137.    Plaintiffs repeat and reallege paragraphs 1-136 above as if set forth fully herein.

138.    An actual, ripe and justiciable controversy exists among the parties regarding their respective owner and authorship rights concerning the Work and the subsequent Derivative Work.

139.    Mr. Doyle did not make any meaningful contributions to either the Work or the Derivative Work which was derived from the Work Plaintiffs and Ms. Crededio co-authored. Therefore, Defendant cannot establish that his copyright registration is valid.

140.    Plaintiffs are entitled to a declaration that the copyright registration held by Ms. Crededio is invalid on account of her committing fraud on the U.S. Copyright Office by failing to list Plaintiffs as co-authors of the Work she registered with the U.S. Copyright Office in or around November 15, 2019 and which bears the registration number PAu004003038.

141.    Plaintiffs are entitled to a declaration that the copyright registrations held by Mr. Doyle are invalid.

142.    Plaintiffs are also entitled to a declaration that their copyright registration is valid, and Plaintiffs are therefore are co-owners and authors of the Work with Ms. Crededio and are the sole authors of the Derivative Work.

143.    If this Court should find that Mr. Doyle made any independently copyrightable contributions to the Derivative Work, which Plaintiffs dispute, Plaintiffs ask that in the alternative for a declaration pursuant to 28 U.S.C. §§ 2201, that Plaintiffs and Mr. Doyle are co-authors of the Derivative Work.

## COUNT TWO

**(Copyright Infringement by Kevin Doyle Concerning "Untitled Wyoming Project" a.k.a. The Monarch)**

144.    Plaintiffs repeat and reallege paragraphs 1-143 above as if set forth fully herein

145.    Plaintiffs are the owners of a valid copyright of "Untitled Wyoming Project" a.k.a. The Monarch, Registration Number PAu004057984.

146.    Mr. Doyle copied Plaintiffs' original expression from the copyrighted work when he submitted his application for a copyright to the U.S. Copyright Office and when he pitched the Work to talent agencies, including "Zero Gravity Management."

147.    Mr. Doyle's October 9, 2020 copyright registration of Wonderland: *The Equality State"* is a direct copying of Plaintiffs' solely authored Derivative Work. Mr. Doyle falsely recording himself as "Wonderland: *The Equality State's*" owner and author infringed on Plaintiffs' copyright rights.

148.    Even in the event that Ms. Crededio authorized Mr. Doyle to create a derivative work concerning the Work she co-authored with Plaintiffs, such authorization did not permit Mr. Doyle to copy and register Plaintiffs' Derivative Work as his own.

149.    Mr. Doyle's attempts to pitch the Derivative Work to talent agencies including "Zero Gravity Management" infringed on Plaintiffs' exclusive copyright rights.

150.    The continued refusal to cancel the October 9, 2019 copyright registration, and cease the pitching of Plaintiffs' Derivative Work to talent agencies after being given notice by Plaintiffs that such refusal infringes on Plaintiffs' rights constitutes willful infringement of Plaintiffs' rights of exclusive acts concerning the Work under 17 U.S.C. § 106.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully demands judgment as follows:

A.    For a judgment declaring (a) that the copyright registrations held by Ms. Crededio and Mr. Doyle respectively are invalid and (b) that Plaintiffs' copyright registration is valid and that Plaintiffs are therefore are 1.) co-owners and authors of the Work registered by Ms. Crededio in or around November 15, 2019 and 2.) are the exclusive owners and authors of the Derivative Work registered with the Copyright Office by Plaintiffs on November 27, 2020 and entitled "Untitled Wyoming Project" a.k.a. The Monarch, which bears the registration number PAu004057984.

B.    Finding that Ms. Crededio has committed fraud on the copyright office by falling to include Plaintiffs on her November 15, 2019 registration with the Copyright Office.

C.    Finding that Mr. Doyle has infringed on Plaintiffs' exclusive rights by filing his own registration based off "Untitled Wyoming Project" a.k.a. The Monarch with the U.S. Copyright Office, and attempting to pitch the work to various talent agencies.

D.    For attorneys' fees and costs;

E.    Such other and further relief as the Court deems just, equitable, and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: May 5, 2023

**GRANT & EISENHOFER P.A.**

*/s/ Caitlin M. Moyna*
Jay W. Eisenhofer
Caitlin M. Moyna (Admitted - Bar No. 3278)
Thomas Walsh
485 Lexington Avenue
New York, New York 10017
jeisenhofer@gelaw.com
cmoyna@gelaw.com
twalsh@gelaw.com
*Attorneys for Plaintiffs Christopher Gentile and*
*Juan A. Crawford*